**David E. ROLF, Plaintiff,**

v.

**BLYTH EASTMAN DILLON & CO., INC., et al., Defendants.**

No. 73 Civ. 2967.

United States District Court,
S. D. New York.

Jan. 17, 1977.

**1024**

Sidney B. Silverman, Silverman & Harnes, New York City, for plaintiff.

Thomas W. Kelly, Richard W. Lyon, Breed, Abbott & Morgan, New York City, for defendants Blyth Eastman Dillon Co. and Michael Stott.

Barry A. Tessler, New York City, for defendant Akiyoshi Yamada.

PIERCE, District Judge.

## OPINION AND ORDER

This securities action brought by plaintiff David E. Rolf presents important questions concerning the duties and responsibilities of a broker dealer and its registered representative under circumstances in which their customer is being defrauded by his investment adviser. Unlike the usual case brought under the federal securities laws, here it is clear that fraud and breach of fiduciary duty are present. The key questions in this case are whether the broker aided or participated in the fraud, and whether the broker and his employer took adequate steps to protect their customer against the investment adviser who traded plaintiff's account pursuant to a power of attorney.

The matter was tried before the Court without a jury for nine days in June and July 1976. The allegations of the complaint are as follows.

Plaintiff David Rolf's complaint seeks to hold defendants liable in damages for alleged violations of Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, which prohibits securities fraud by any person through the instrumentalities of interstate commerce or of any facility of any national securities exchange. Also claimed are violations of Section 15(c)(1) of the Exchange Act, and Rule 15cl–2, which similarly prohibit securities fraud by broker dealers in the over-the-counter markets. Plaintiff also alleges violations of Section 15A of the Exchange Act, dealing with registration and regulation of broker dealer associations, and of Article III, Section 2 of the Rules of Fair Practice adopted by the National Association of Securities Dealers, Inc. ("NASD") promulgated thereunder, the latter requiring suitability of securities recommended by brokers for investors. Finally, plaintiff asserts violations of Rule 405(1) and (2) of the New York Stock Exchange ("NYSE"), which require due diligence and diligent supervision in the management of securities accounts handled by registered representatives.

This Court has jurisdiction over this action brought to enforce liabilities and duties created under the Exchange Act and by the rules and regulations promulgated thereunder pursuant to 15 U.S.C. § 78aa.

In brief, plaintiff claims that the defendants churned his account, that they severely altered the nature of his securities portfolio by placing unsuitable securities therein, that they failed to properly supervise his account, and that they aided and abetted

each other in these alleged violations. In sum, plaintiff claims that the defendants took an account worth $1,423,000 in May of 1969 and returned to him in January of 1971 an account worth only $225,000 as a result of their fraud. For damages, plaintiff seeks, inter alia, a return of commissions and interest; an award equal to the net trading losses claimed; and, although the complaint states no cause of action under state law, punitive damages of one million dollars.

At the trial of this action, plaintiff abandoned all claims made against his investment adviser, defendant Akiyoshi Yamada, in exchange for Yamada's testimony against the remaining defendants (see PX–19). Defendants Blyth Eastman Dillon & Co. ("BEDCO") and its registered representative Michael Stott assert that they are not liable becáuse plaintiff has not proved his claims, because Yamada and not the other defendants controlled plaintiff's account, and because they breached no duty owed to the plaintiff. In their answer defendants BEDCO and Stott assert crossclaims against Yamada for indemnity.

Having heard all the evidence and having considered the matter, the Court dismisses plaintiff's churning claim, but finds defendants BEDCO and Stott liable for violations of the NYSE and NASD rules, which violations involved breach of defendants' fiduciary duties tantamount to fraud. The Court also finds defendant Stott liable for aiding and abetting Yamada in the fraud which the investment adviser perpetrated upon plaintiff in violation of Rule 10b–5 and through breach of his own fiduciary duties. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) Fed.R.Civ.P.

### The Parties

Plaintiff David E. Rolf is a physician, surgeon and ophthalmologist residing in Shaker Heights, Ohio. Dr. Rolf has practiced medicine since 1936, and at the time of trial he was sixty-eight years old. Rolf began investing his earnings in the stock market in 1950, and by 1962 his portfolio was worth approximately $400,000. Plaintiff testified that he works long hours at the hospital, and that he is on twenty-four hour call. During the period 1950 through 1962, plaintiff retained several different Cleveland brokers, switching firms often because he felt that the brokers were not sufficiently knowledgeable and that they did not have his interests at heart. During this period plaintiff maintained non-discretionary accounts, making his own decisions with respect to transactions in securities. Rolf was an active follower of the stock market, primarily through the Wall Street Journal. Prior to his first contact with BEDCO in 1963, plaintiff had maintained accounts at Merrill Lynch, Pierce, Fenner & Smith, Inc., Paine Webber & Co., Hartzmark & Co., Prescott & Co., Bache & Co., and finally, at Walston & Co. where Rolf first engaged an investment adviser with discretionary authority over his securities. Rolf stated that during this period his investment objective was capital growth first and security second. Plaintiff testified that he switched to discretionary accounts in 1962 because he was too busy with medicine to be in constant consultation with brokers, and because he felt his portfolio was too large for him to handle.

In 1963, plaintiff took his securities to Eastman Dillon Union Securities & Co., and entrusted their management to S. Logan Stirling, a partner and a prominent investment adviser associated with that firm and with defendant BEDCO, the successor corporation to Eastman Dillon Union Securities & Co. BEDCO was at all relevant times a registered broker dealer and a member of the New York Stock Exchange and the National Association of Securities Dealers. During the relevant period, BEDCO engaged in corporate and municipal underwritings, maintained a large research department, and employed a substantial retail sales force. BEDCO dealt in listed and over-the-counter securities for individual clients and as a market-maker (Tr. 1005).

While Dr. Rolf did not come into contact with BEDCO's Michael Stott until 1969, Stott had been a registered representative

with that firm since 1958, and in 1963 Stott was branch manager of BEDCO's Paterson, New Jersey, office. Later Stott became branch manager of BEDCO's Newark office; at each branch office one of his primary responsibilities was supervision of the registered representatives (Tr. 757). In the fall of 1967 Stott returned to BEDCO's New York office as a registered representative. By 1969, Stott was handling approximately 150 individual and institutional accounts at BEDCO, earning one-third of all commissions on the securities he traded (Tr. 914–15). That year Stott first met a young and ambitious investment adviser Akiyoshi Yamada.

Yamada, the son of a wealthy Japanese industrialist, had attended Harvard Business School for one year prior to 1965 when he joined the investment banking firm of Kuhn Loeb & Co. (Tr. 557). Yamada described Kuhn Loeb as a conservative and prestigious firm which generally handled "triple-A" clients (Tr. 509). At Kuhn Loeb, Yamada eventually became an officer of the firm purportedly with expertise in research and "special situations". In 1969, at the age of 26, Yamada left Kuhn Loeb to form an investment partnership; during the period of the complaint he was not associated with any research firm or brokerage house (Tr. 558).

Yamada was described at trial by John P. Cione, BEDCO's chief compliance officer, as one of a "new breed" of young money-managers who emerged as highly successful in the stock market during 1969 and 1970. Yamada was committed to "special situations" and was one of a number of young advisers who were making mutual funds, hedge funds, and assorted speculative ventures very profitable (Tr. 1111). During the period of the complaint Yamada was handling six sizeable portfolios, three institutional and three individual, of which Dr. Rolf's was the largest individual account. Yamada traded plaintiff's stocks on a discretionary basis from April 1969 through January 1971 (Tr. 1041–42).

In 1972, defendant Yamada was enjoined by the Securities and Exchange Commission from engaging in fraudulent and manipulative practices in connection with the purchase and sale of securities. On December 21, 1972, at the age of thirty, Yamada pleaded guilty before Judge Irving Ben Cooper of this Court to a criminal conspiracy to violate the federal securities laws as set forth in Count One of Indictment 72 Cr. 363, in connection with the sale of Lady Goldie Bracelet Co. securities. On May 18, 1973, Yamada pleaded guilty to two further violations of 18 U.S.C. § 371 set forth in criminal informations 73 Cr. 426 and 73 Cr. 427, in connection with a securities fraud involving Microthermal Applications, Inc., and a manipulation of Health Evaluation Systems, Inc., the stock of the latter being one involved in this action. On June 26, 1973, Judge Cooper sentenced Yamada to two years in prison, five years on probation, and fined him $30,000. Thereafter, on April 15, 1974, Yamada pleaded guilty to submitting false statements to Judge Cooper in support of a motion to reduce or suspend his sentence, in violation of 18 U.S.C. § 1001. For this crime, Judge Morris Lasker of this Court sentenced Yamada to one year, later reduced to six months, consecutive to the previously imposed period of imprisonment. (See DX–VV). Yamada admitted each of these convictions at trial, and further admitted that he had perjured himself before the Securities and Exchange Commission (Tr. 695).

The foregoing discussion raises questions regarding Yamada's credibility as a witness in this action. However, the Court finds that on many points Yamada's testimony is supported by that of Rolf or by documentary evidence. Further, the Court finds that it cannot credit the whole of the testimony of either of the other two principal witnesses, Dr. Rolf and Michael Stott.

*Plaintiff's Investment Intent*

Dr. Rolf's claim that he was an unsophisticated investor is undercut both by the events leading up to and those during the period of the complaint. First, as noted, plaintiff in earlier years had engaged a series of brokerage firms on a non-discre-

tionary basis. Further, plaintiff makes no complaint concerning the securities bought for his account by S. Logan Stirling of BEDCO from 1963 through March 1969, and there is substantial evidence that certain of those stocks were aggressive investments.

The best evidence of Rolf's investment intent during the Stirling period is contained in a letter from the plaintiff to Stirling dated June 14, 1967:

"My objective is to double my equity. It will be interesting to see how long it takes." (DX–C)

Plaintiff testified that during the Stirling period, he would have been happy with an annual growth rate of ten percent, but that he would have been dissatisfied with anything less (Tr. 315).

There is substantial evidence that Dr. Rolf kept careful watch over his securities. During the period of the complaint, plaintiff checked the published prices of his securities three or four times per week (DX–III). He also employed a bookkeeper to keep track of his holdings and their value, both during the Stirling period and during the period of the complaint (Tr. 307; PX–24).

Further, although Rolf gave Stirling complete discretionary authority over his account (DX–P), the doctor telephoned Stirling's office as many as six times per week (Tr. 741). Rolf testified that he was fully satisfied with Stirling's handling of his BEDCO account, and pleased by the fact that the size of the portfolio more than doubled in the six years between 1963 and 1969.

In mid-March 1969, S. Logan Stirling took ill and left BEDCO, having suffered a brain tumor which proved fatal. Plaintiff claims, but the evidence does not support the conclusion, that Stirling was incapacitated as early as late 1968. However, the Court does conclude that from March through early May 1969, Rolf's million-dollar account went unattended by anyone at BEDCO. BEDCO's compliance officer admitted not only that the account was "dormant" during the period between Stirling's illness and Rolf's selection of Yamada, but

further that during April 1969 some unidentified person at BEDCO sold one thousand shares of Talcott National Corp., purchased one thousand shares of Asamera Oil Corp., and sold one thousand shares of Occidental Petroleum Corp. (Tr. 1069–71; see DX–UU). This apparent indifference to plaintiff's investment needs at BEDCO is further illustrated by the manner in which Akiyoshi Yamada came to be selected as Rolf's investment adviser.

Michael Stott testified that following Stirling's departure from BEDCO, Mr. Schlesinger, a BEDCO partner, assigned the Rolf account to him. In late April 1969, Stott telephoned Rolf and offered to handle his account. Rolf stated that he wanted an investment adviser, and that Stott, while a capable and experienced broker, was just not an analyst with sufficient expertise to direct his investments. However, Rolf was willing to keep the account at BEDCO, and he asked Stott to recommend an investment adviser.

Stott testified flatly that he never knew what Rolf's investment objectives were (Tr. 881–82), and further, that he did not even look at the stocks in plaintiff's portfolio prior to their first contact (Tr. 941–48). Accordingly, the Court concludes that Stott recommended two advisers, Akiyoshi Yamada and Donald Geddes, knowing nothing about the plaintiff beyond the fact that Rolf's account had been handled by Mr. Stirling.

While Stott's trial testimony on the point is somewhat inconsistent with his deposition (see Tr. 888–89), it appears that Stott did little more than give plaintiff two names and two telephone numbers.

Dr. Rolf testified that Stott told him Geddes had experience with large accounts; however, according to the plaintiff, Yamada was more fully described. Stott told Rolf that Yamada had a Harvard Business School background, that he was from an illustrious and wealthy Japanese family, and that he was a brilliant analyst. Rolf travelled to New York shortly thereafter to interview the two.

Rolf and Yamada met in a New York restaurant to discuss plaintiff's investments. Rolf thought Yamada both brilliant and capable, but was somewhat wary of Yamada's youth (Tr. 31). When Rolf spoke of an interest in preserving his equity, Yamada assured him that none of his clients had ever lost a penny (Tr. 30).

Yamada's testimony concerning Rolf's objectives is consistent with the rest of the evidence in the case. While Yamada stated that Rolf was unsophisticated and "groping" for guidance, it was clear to Yamada that Rolf wanted a very aggressive investment program, and that he was willing to engage in extensive trading in order to "double his equity" (Tr. 511, 514; PX–3).

Yamada's testimony to the effect that Rolf was interested in special situations, new issues, and aggressive trading is confirmed by a letter written by Rolf to Yamada much later. In that letter dated September 2, 1970, Rolf referred to his original investment intent as follows:

"As you recall, we started out with roughly $2,000,000. of Securities which could be used for trading. . . . It was my impression that we would wind up with 3.5 to 5 million in a years time." (PX–3)

In brief, Dr. Rolf decided that Yamada would be an appropriate investment adviser, and although he also interviewed Geddes, plaintiff settled on Yamada.

Rolf and Yamada agreed that Yamada would receive compensation equal to ten percent of plaintiff's capital gains. Rolf requested that trading be done through BEDCO and Stott, if at all possible. Rolf testified repeatedly, and the Court credits the statements, that Rolf sought to balance Yamada's youth and zeal with BEDCO and Stott's reliability and supervision. Indeed, in the plaintiff's mind, by the combination of Stott and Yamada, he was obtaining a "Stirling-type" operation (Tr. 35). Rolf told Stott that he expected BEDCO to look after his account, and that he didn't intend to keep his commission business at BEDCO without receiving something in return (Tr. 34). On May 9, 1969, Rolf executed a trading authorization granting to Yamada full discretionary authority over his BEDCO account:

"Messrs. Eastman Dillon,
Union Securities & Co.
"Gentlemen:
"I hereby authorize AKI YAMADA to buy, sell, including short sales, and trade in, for my account and risk and in my name, stocks, bonds and any other securities . . . . You will kindly follow his instructions in every respect concerning my account with you . . . as he may order and direct. In all matters and in all things aforementioned he is authorized to act for me and in my behalf in the same manner and with the same force and effect as I might or could do . . . ." (DX–B)

### The Stocks

It is clear from the evidence that in May 1969, Rolf expected Yamada to take substantial risks for capital gains, but at the same time to preserve the million dollar portfolio which Rolf had built up over the years through his own earnings and efforts and through the efforts of prior brokers. Indeed, since Rolf had no pension or retirement plan, his stocks represented his main security for his later years (Tr. 19).

It is also clear that Rolf expected BEDCO to supervise his account and Rolf understood that Stott was to look after his interests. As Rolf testified, he made this clear to Stott at the outset:

"I said, 'Mike, I can take this account any place. I am going to leave this account here,' but I said, 'Look, I want you to watch this. After all, you are going to be compensated for this, you are going to get all the commission business, and when I am back in Cleveland and busy, you keep your eye on things.'" (Tr. 34)

Contrary to his expectations, Rolf received from Yamada only the substantial risks and he received no supervision by BEDCO. The explanation lies in how Stott and Yamada saw their respective roles and in the very effective methods they used to shuffle Rolf between the two of them.

On May 9, 1969, the date when Rolf gave Yamada the trading authorization, Rolf's margin account contained twenty-three issues, all but one of which had been purchased by Stirling:

Loew's Theatres Wts.
Leasco Data Processing Wts.
Anaconda Co.
Asamera Oil Corp.
Avnet Inc.
Buttes Gas & Oil Co.
CNA Financial Corp.
Cities Service Co.
Ebasco Industries Inc.
Glen Alden Corp.
INA Corp.
International Industries Inc.
General Electric Co.
Leesona Corp.
Levin Townsend Computer Corp.
Loew's Theatres Inc.
National General Corp.
Occidental Petroleum Corp.
Penn Central Co.
Pittson Co.
Raytheon Corp.
Scientific Resources Corp.
Teledyne Inc.
(DX–UU at 2)

With the exception of the two warrants, each of the above securities were listed on the American or the New York Stock Exchange. Eighteen were issued by companies that had enjoyed continuous profits for five years or longer. Sixteen paid cash dividends. Yamada characterized six of the issues as "blue chip" and plaintiff's expert witness made similar observations. Yamada described the warrants as "aggressive" investments and two of the stocks as "racy". As of May 9, 1969, after reducing the value of the portfolio by the debit balance, plaintiff's margin account was worth $1,423,000 net.

Both Yamada and Rolf testified that they agreed in April 1969 to make certain changes in the account. Yamada was of the opinion that many of the stocks involved had seen their day, and that it was time to move on to newer and more profitable investments. However, Yamada stated that Rolf did not agree to liquidate the account; that decision was made by the adviser alone. Between May 1969 and January 1970, Yamada sold all 23 issues, 14 at a loss. Plaintiff made no complaint.

The evidence in this case most fraught with hazards concerning credibility is the testimony of Stott and Yamada regarding their relations with each other. However, it is clear that the two were in contact by telephone several times daily.[1] Further, Stott continually conveyed to Yamada the recommendations of BEDCO's research department with respect to certain issues, and many of those stocks were subsequently purchased for Rolf's account.

While Yamada and Stott met socially only on occasion, it is clear that their business interests were intertwined. Yamada stated that he relied upon Stott for recommendations with respect to oil and gas stocks; Stott's testimony on this point is equivocal.[2] There is no dispute that Stott had family connections with the management of two oil companies whose issues were purchased for Rolf, Standard Oil of New Jersey and West Coast Production.

Stott testified that he handled a total of six accounts referred to him by Yamada, but he stated that these accounts produced only a small proportion of his commission income (Tr. 794–95). Of the forty-one issues purchased for Rolf by Yamada and Stott during the complaint period, thirty-five were at some point traded through BEDCO (PX–24). Yamada testified that Stott recommended a total of twelve of the issues involved (Tr. 518–530); Stott admitted to recommending six of these.

With respect to the stocks which he did admit he recommended to Yamada, Stott

---

1. Stott testified in his deposition that he spoke to Yamada only twenty or thirty times during the entire one and one-half year period. However, at trial Stott admitted that he was in daily contact with Yamada (Tr. 775, 817).

2. When asked if oil stocks were one of his specialties, Stott answered "not really" (Tr. 965). Stott did admit that Yamada bought Rolf oil stocks "partially" on his advice (Tr. 965).

testified that he did not specifically recommend the stocks for Rolf. Rather, Stott maintained that he simply gave Yamada the results of BEDCO's research, and that the recommendations were in actuality for Yamada's more speculative ventures, such as Takara Partners and the hedge funds (Tr. 780–81). The Court does not find this attempted distinction credible, particularly in light of the fact that Stott himself continually executed purchases and sales in these very stocks for Rolf's account; in these circumstances, there can be little doubt that Stott realized that Yamada was, at least in part, relying on the recommendations made by Stott and by BEDCO research in determining what to buy for the plaintiff; indeed, Stott admitted as much (Tr. 965).

Moreover, BEDCO's cross-index of all securities traded by Stott reveals that as to seven, not six, of the issues, Stott was at the time in question recommending and buying the stocks for his *non*-discretionary accounts of other customers (see PX–25). With regard to three more of the stocks listed by Yamada, the cross-index shows that Stott bought the issues for other investment advisers as well as for Yamada. Finally, as to one issue which Yamada claimed Stott was recommending, defendants report that there is no record in the cross-index as to whether or not Stott bought this issue for others (see PX–25). While PX–25, standing alone, does not establish that Stott recommended each of the twelve issues for Rolf, the document does serve to credit the testimony of Yamada to the effect that Stott was involved with the decision to purchase the issues.[3] Accordingly, in light of all of the findings hereinabove, and weighing all the evidence on the question, including the Court's observation of the demeanor of the witnesses, the Court concludes that Stott either recommended or was somehow involved with the decision to purchase the following twelve securities for plaintiff:

Simplex Wire & Cable Co.
Teradyne, Inc.
Standard Oil, N. J.
Reading & Bates Offshore
Intertherm, Inc.
Food Fair Properties
International Funeral
Natomas Corp.
Asamera Oil Corp.
Carter Wallace, Inc.
West Coast Production
Equity Funding Corp.
(PX–25; Tr. 518–530)

Accordingly, contrary to his testimony at trial, the Court finds that Stott was indeed involved with the management of the Rolf account, particularly during the first eight months of the complaint period.

One internal regulation at BEDCO prevented the trading of certain stocks through the firm. According to BEDCO's compliance officer, BEDCO would not solicit stocks which were selling at less than $5.00 per share (Tr. 978–79). For this reason, as well as for reasons of his own, between May 1969 and March 1971, Yamada opened no less than eight other accounts in plaintiff's name at eight different brokerage firms. Plaintiff stated that he was almost completely ignorant as to why all these other accounts were being opened. Upon inquiry, he learned that in some cases, Yamada had opened the accounts to give other broker associates some business; in other cases, Yamada opened the accounts to buy stocks from the firms that were engaged in underwriting new issues which BEDCO would not handle.

Despite these new accounts and the purchase and sale of stocks through those houses, Dr. Rolf was under the impression that BEDCO was looking after his portfolio as a whole. Indeed, the BEDCO account was a custody account, and in the great majority of cases where stocks were bought elsewhere by Yamada, Stott nevertheless received confirmation slips and the securities were delivered into BEDCO. Even though

---

**3.** The Court notes that Yamada's testimony as to the twelve issues allegedly recommended by Stott was given *before* defendants produced the documents constituting the cross-index, PX–25.

BEDCO received no commissions on these outside purchases, in a few cases the stocks were subsequently sold through BEDCO, producing commissions for Stott and his employer. According to Dr. Rolf, Stott assured him that BEDCO could still oversee the account since the stocks were often delivered in, and since confirmation slips were sent to Stott.

As Yamada's liquidation program quickly resulted in a wealth of new issues, many of which were over-the-counter stocks, Dr. Rolf was apparently both excited by the challenge of speculation and concerned over the strange names of the new issues. Beginning in July 1969, Rolf began calling Stott for assurance and for information about the new stocks. Stott testified that Rolf called him six or seven times per month from July 1969 through May 1970. Thereafter, Stott or his secretary called Rolf every day to give him quotations on the over-the-counter prices. There is no evidence that Rolf and Yamada were in such frequent contact.

The testimony is consistent that Rolf called Stott to complain about the amount of trading and the nature of the stocks in the account. Stott stated that he simply told Rolf to speak to Yamada. However, plaintiff's version of the calls, which is supported by certain documentary evidence and by the testimony of Yamada, is that Stott continually assured Rolf with respect to Yamada's competence and ability, and that Stott repeatedly stated that if Yamada had decided to buy a stock, then Stott was sure that it was okay. Yamada referred to this arrangement as a procedure whereby if Rolf called him to complain, Yamada would call up Stott and tell Stott to speak to Rolf and "hold his hand." (Tr. 545) The Court finds that this was exactly what occurred.

Rolf believed that Stott was intimately involved with the management of the account. Indeed, since Stott and Yamada were in daily contact discussing securities which ended up in the plaintiff's account, Rolf's was a reasonable belief. It was moreover a correct belief; Stott *was* involved with the management of the account.

The period between May 1969 and January 1970 was characterized by the sale of the listed stocks and the purchase of very different issues. While there was some short-swing trading in U. S. Natural Resources between May 22 and 26, 1969 (DX–UU at 3), and while there was one short-swing trade of International Funeral Services in December 1969 (DX–UU at 17), Yamada's program during that period was a gradual liquidation of the Stirling securities and the purchase of large quantities of unlisted and even restricted stocks. By the completion of the transformation in January 1970, the account stood as follows:

Delanair, Inc. (restricted)
Food Fair Properties, Inc.
Holobeam, Inc.
Monarch Industries, Inc.
Synchronex Corp.
West Coast Production Co.
Benquet Consolidated Corp.
Equity Funding Corp.
Outlet Company
Simplex Wire & Cable Co.
(DX–UU at 20)

In eight months, the value of Rolf's securities had dropped by over $700,000. Further, while his net position was approximately $712,000, $338,000 of this was invested in Delanair, a restricted stock through which plaintiff was clearly defrauded by Yamada.

In August of 1969, Yamada persuaded Rolf to invest nearly $400,000 in stock, calls and warrants of Delanair, Inc. The securities were purchased through BEDCO, but the parties all agree that the stock was initially Yamada's idea and that Stott received no commissions on the purchase. Rolf was concerned that the investment would tie up too large a portion of his money, so he telephoned Stott after he had spoken with Yamada but before the funds had been committed. Stott stated that if Yamada had recommended the transaction, then it must be okay; in effect, Stott said to go through with it (Tr. 82). The Court does not accept Stott's statement to the

effect that he never discussed the stock with anyone.

The lure of the Delanair investment was Yamada's representation to plaintiff that there would be a secondary or a public offering of the stock in six months and that Rolf would double or triple his investment thereby. Rolf stated at trial, and the Court finds, that Yamada's promise of a secondary offering was fraudulent.

Delanair never did achieve a secondary offering, and plaintiff found himself with restricted stock which rapidly declined in value. In 1972 Rolf brought a civil action against Delanair, Yamada, D. H. Blair & Co., and others; in 1973 that action was settled for $175,000.[4] BEDCO was not a party defendant to that action (DX–NN through DX–QQ). When asked to assess the quality of the Delanair issue, plaintiff's expert witness described the stock as the "lowest of the low".

Four of the issues in plaintiff's BEDCO account as of January 1970 were, as the Court has found, bought on Stott's recommendation or with his participation: Food Fair, West Coast Production, Equity Funding, and Simplex Wire. Each of these stocks was eventually sold at a loss, the total amounting to over $65,000. However, there is no evidence that any of these four stocks were unsuitable for Rolf.

Monarch Industries was another substantial investment made by Yamada for Rolf in an obscure issue which resulted in a substantial loss. The stock was both bought and sold through brokerage houses other than BEDCO. Although Yamada stated that he discussed the stock with Stott between May and June 1969, he testified that the investment was his own decision. Rolf lost $159,000 on the transaction (PX–24). Plaintiff's expert witness rated Monarch as "low quality".

Two other stocks bought in this period merit discussion, for they indicate the beginning of Yamada's trading for Rolf in securities which Yamada knew were being manipulated. The evidence is equivocal with respect to whether Holobeam, bought in January 1970, was manipulated, but Yamada testified that Synchronex Corp., purchased in October 1969, was a manipulated security. It is clear that neither Stott nor Rolf knew that these stocks were being used as vehicles to defraud others. Plaintiff's expert described the quality of these two stocks as "lowest of the low".

While there were many fewer trades in February and March 1970 than there had been in prior months, the market values of Delanair, Holobeam, Monarch and Synchronex declined drastically. On March 29, 1970, the net value of Rolf's account had fallen to $446,000, nearly half of which was still in Delanair. (See DX–UU at 22–24). Rolf by this time was becoming highly disturbed about his stocks, and as noted above, he began calling Stott on a regular basis. In early April 1970, Rolf called Stott and complained that there had been in excess of five million dollars in transactions in the account since May 1969. For the first time Stott responded in writing, and for the first time Stott began to maintain that he was only an "order taker". In a letter dated April 10, 1970, Stott wrote to Rolf as follows:

"As you know, I have absolutely nothing to say over the management and handling of this account. When you signed your contract with Aki it gave him complete discretion. All I am with this account is basically an order taker.

"I think what you should do is sit down with Aki and spell out a complete program to help you recoup the losses that have been incurred in this account in the past year or so."

(DX–E)

Yamada stated that in his opinion this letter was false since Stott was much more than an order taker (Tr. 548). This was also Rolf's view as is seen from a letter written to Stott by Rolf in reply, dated April 15, 1970:

"Since you work closely with Aki, these are his plans for the near future:

---

4. Thus, here plaintiff seeks damages of $225,000 only by reason of the Delanair matter.

1. The utilization of warrants and options as they come up.

2. A take out on Monarch Industries.

3. Placement of Delanair when the Secondary comes out.

\* \* \* \* \* \*

"In the meantime, I would appreciate your doing the following:

1. Have your secretary get a daily quote on my O–T–C securities.

2. Notify me promptly if there is a significant change up or down.

3. Keep me informed regarding any information you consider pertinent."

(PX–1)

Stott testified that while he did not make a written reply to this letter, he did call Rolf and stress that Yamada, and not the broker, was the one handling the account. However, it is clear from the correspondence that followed in the fall of 1970 that Rolf failed to get the message. In September, he sent Stott another letter detailing Yamada's plan for recouping losses (PX–2, PX–3). On October 7, 1970, Rolf wrote a letter to Stott which ended with the admonition: "Remember—you're my man in N.Y. *Please keep* the *program on target.*" (PX–4).

Finally, on December 14, 1970, Rolf wrote to Stott asking him to "please keep your pulse on the situation and also keep me informed." (PX–5). Stott never wrote back to correct that which he now maintains was a continuing misimpression on Rolf's part as to BEDCO's duties.

Despite the fact that Yamada had opened eight new accounts for him, Rolf apparently was not content to leave the management of all of his securities to his adviser. In June 1969, Rolf had opened a non-discretionary account at Hornblower & Weeks Hemphill, Noyes, and over the following months he bought five issues there. The stocks were as follows:

American Scientific Corp.
Dasa Corp.
Data Network Mega Systems, Inc.
Ampex Corp.
Mohawk Data Science
(DX R, DX R–1)

Rolf testified generally that he did not really know anything about these stocks. Indeed, plaintiff's own expert witness, on cross-examination, testified that Dasa Corp. was a "low quality" issue.

During this period, Yamada turned to even more speculative issues in order to make some profits for the plaintiff. He also began investing in issues which he testified were manipulated. According to Yamada, during the Delanair and Monarch ventures, Stott became concerned that there was a lack of trading in the account, and thus a lack of commissions. It is clear that Yamada had no interest in commissions for himself; his compensation was to come from a percentage of capital gains and further, Yamada was given the opportunity to employ Rolf's account as "buying power" for his own manipulations.

According to Yamada, in April 1970 Stott informed him that his superiors at BEDCO were becoming concerned about the Rolf account. However, this statement is not supported by any other evidence and thus the Court is not inclined to credit the testimony. Nevertheless, the Court does give some weight to Yamada's statement that Stott referred to the stocks in the Rolf account as "junk." (Tr. 542–44).[5]

In brief, the Court concludes on this point that Stott did indeed consider many of the securities to be "junk" and that he told this to Yamada. However, it is clear that he never made such a statement to Rolf, and all parties agree that Stott never recommended against any purchase.

During 1970, Yamada bought for Rolf the following securities which Yamada knew were being manipulated, either before or shortly after the dates of purchase:

---

**5.** Again, *Stott's testimony on the point is equivocal;* Stott denied that he had ever threatened to tell Rolf about the "junk" in the account unless Yamada gave him more commissions; however, Stott stated that he did not know if he ever used the term "junk" to describe low quality securities (Tr. 842).

Visual Sciences, Inc.
Health Evaluation Systems
Hair Extension Centers
GPI Enterprises, Inc.
MH Studios
Tranquilaire Mental Health
Creative Polymer Products

Plaintiff's expert testified that in his opinion each of these stocks were "lowest of the low" quality. Many were new issues; all were highly speculative; public information was unavailable as to the majority of the issuers. Stott denied that he recommended any of these stocks, and Yamada testified that he traded in these stocks on his own. Five of the stocks were traded at other brokerage houses, and there is no credible evidence that Stott was aware of the fact that Yamada was using these stocks as vehicles to defraud. Further, Rolf was not the victim of the manipulations; Yamada made fairly substantial profits for Rolf on short-term trading in six of the seven manipulated stocks. Indeed, Yamada testified that in his opinion these stocks were suitable for Rolf (Tr. 696–702). For the reasons discussed within, the Court concludes otherwise.

Yamada also undertook further schemes in an attempt to recoup losses for Rolf through speculative ventures. Yamada and Rolf decided to sell Monarch Industries at a significant loss and invest the proceeds in the Takara Partners hedge fund. Yamada also continued to assure the plaintiff that Delanair would some day come through with its secondary offering. As late as September 1970, Rolf still apparently believed that he could regain his lost capital by speculative ventures, including "special situations", "new issues" and "founder's stock" (see PX–3). He wrote to Yamada by letter dated September 2, 1970, and indicated that he was continuing to discuss with Stott the question of Yamada's competence to achieve plaintiff's investment goals. In this letter Rolf began to once more emphasize the need for preservation of capital:

"For future endeavors in the years to come, it is obvious that we must again regain the same substantial base we started from. The old rule that the preservation of capital is the first rule of investment has never been more true." (PX–3)

Through the end of the year 1970, as plaintiff's net position declined to $225,000, Rolf continually sent to Stott copies of his correspondence with Yamada. It was during this period that Rolf referred to Stott as his "man in New York" and asked Stott to keep his pulse on the situation. However, in late January 1971, Rolf took the step of purchasing four conservative listed bank stocks through another broker at BEDCO. Shortly thereafter, the SEC investigation of Yamada became public knowledge. BEDCO was visited by representatives of the Commission. BEDCO's chief compliance officer called Stott in and informed him that BEDCO would take no further orders from Yamada for the Rolf account. Shortly thereafter plaintiff was informed of the SEC investigation. The balloon of Yamada's manipulations was collapsing.

In his testimony at trial, Yamada described the functional aspects of the several manipulations involved in this lawsuit. Generally, Yamada along with a group of other money managers and underwriters would seek to obtain control of new, thinly-traded, over-the-counter securities. Once the group had purchased the great majority of the outstanding shares, they would begin to trade the stock up, by selling to each other at gradually higher and higher prices. Thus, the market price would be manipulated upwards, and other investors would become interested in the stock, thinking that the price rise was due to legitimate factors. At the end of the manipulation, the conspirators would sell out, leaving an unsuspecting group of investors with a large amount of artificially-inflated stock. Often, once the manipulators left the scene, the price of the stock would plummet, as was the case with Health Evaluation Systems (Tr. 624–25).

Yamada testified that he often assured Stott that these stocks were "under con-

trol" and that the price would "go up". Similarly, Yamada stated that he told Stott there was a "box", a term Yamada used to encompass not only control over a given security, but also an illegal manipulation (Tr. 600–27). Stott testified that he knew nothing wrong about any of these stocks, in effect denying that he ever knew of the manipulations. Stott also denied ever hearing the term "box" used to imply or indicate a manipulation (Tr. 842–57). Faced with this direct conflict between Yamada and Stott's testimony, the Court chooses to discredit the allegations made by the investment adviser. However, as noted above, the Court does find that Stott knew these stocks were highly speculative, that they were "high-fliers" and that for the most part, they were "junk".

At trial, Stott described what he believed were his duties to Rolf during the period in question. In brief, Stott claimed that he was no more than an "order taker" whose job it was to add up the debits and the credits. Stott saw himself as a "bookkeeper" (Tr. 814) and he limited his supervisory activities to a five-minute monthly review of the plaintiff's statements (Tr. 821). Stott testified that he believed the phrase "my man in New York" in Rolf's October 1970 letter (PX–4) to mean that Rolf expected Stott to act as a diligent order taker (Tr. 833). He stated that to him, the phrase "please keep your pulse on the situation" in PX–5 meant that Rolf expected him to add up the debits and the credits accurately (Tr. 836). Stott stated that he *never* knew plaintiff's investment intent (Tr. 881–82). Stott also stated that he never sent Health Evaluation or Hair Extension through BEDCO research to determine whether either was an appropriate investment for plaintiff (Tr. 901).

Stott and his employer maintain that they are relieved of almost every regulatory and fiduciary duty owed to Rolf solely because of the trading authorization executed by Rolf for Yamada. When asked by the Court to describe his view of his duties to a customer where the account was being traded by an investment advisor, Stott responded as follows:

"Unless there was something blatantly wrong with the order that I got from an investment advisor, or I had knowledge that this was, you know, something illegal was going on in the security, and if my firm permitted the order to be executed, I felt it was perfectly all right, yes. That is what I had been told." (Tr. at 863)

The testimony of BEDCO's chief compliance officer, John P. Cione, was to the same effect. As far as BEDCO was concerned in 1969–1970, if an investment advisor was in the picture, the brokerage firm was relieved from (1) the duty to investigate trading that appeared to be excessive; (2) the suitability of transactions made for the customer through the firm; and (3) the general duty to know the customer and learn the essential facts about him and his needs (see Tr. 1095).

Although BEDCO employed a computer-assisted program to detect excessive trading, and although that system was able to detect any monthly trading in any account which would exceed 3.5 if computed for an annual period, Cione testified that once the compliance officer determined that the trading was occurring in an investment advisory account, no further questions would be asked (Tr. 1074). Further, said Cione, even had the officer gone further and spoken to Stott, the fact that Yamada was the adviser would have itself foreclosed further inquiry, due to Yamada's reputation at the time.

BEDCO did no study of any of the stocks bought for Rolf elsewhere and delivered into the custody account. While the firm did require that any stock with a rating below B-plus receive special research approval before a broker could recommend it, BEDCO did not apply any such "suitability" standard to stocks purchased in discretionary accounts run by investment advisers (Tr. 1049). Thus, despite the fact that many of the stocks bought for Rolf were not even listed in any rating manuals at all, and despite the fact that many of them

**1036**

were "high-flying" new issues which Yamada was manipulating, BEDCO never identified as unsuitable any security purchased for Rolf.

Thus, with the exception of the recommendations made by Stott in the early part of the period, it appears that the only services rendered to Dr. Rolf by Stott and BEDCO were trading the account and dutifully mailing to plaintiff confirmation slips. For these efforts the defendants BEDCO and Stott received commissions in a total amount of approximately $42,000. Stott testified that his one-third share was only a small percentage of his total income in 1969–1970.

### Discussion
#### The Duties of Brokers

The registered representative of a broker dealer occupies a unique position in the scheme of securities regulation. Since he as broker is the person who actually trades securities for the investing public, his very employment is "in connection with the purchase and sale of securities." (Rule 10b–5). Indeed, a broker such as the defendant Stott conducts himself and carries out his daily routine through the instrumentalities of the national security exchanges and the over-the-counter market. (Rule 10b–5; Rule 15cl–2).

For these and related reasons, courts have concluded that the broker, by virtue of his position, owes a fiduciary duty to his customer. *Moscarelli v. Stamm*, 288 F.Supp. 453 (E.D.N.Y.1968); *Lorenz v. Watson*, 258 F.Supp. 724 (E.D.Pa.1966). See *Carras v. Burns*, 516 F.2d 251, 258 (4th Cir. 1975); *Hanly v. SEC*, 415 F.2d 589, 597 (2d Cir. 1969). Since brokers are traditionally compensated by commissions in direct proportion to purchases and sales, the opportunity to take advantage of the client is always present. To ensure that the broker fulfills his fiduciary duty, and to protect against frauds upon the customer, the broker and his employer are made subject to a series of obligations, the fraudulent breach of which may render them liable to the investor in damages. See *Zweig v. Hearst*

*Corp.*, 521 F.2d 1129, 1135 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); Jacobs, *The Impact of Securities Exchange Rule 10b–5 on Broker Dealers*, 57 Cornell L.Rev. 869 (1972). Among the possible liabilities involved in the instant action are damages for alleged violations of Rule 10b–5 and Rule 15cl–2, and of the rules of the New York Stock Exchange and of the National Association of Securities Dealers.

Rule 405 of the New York Stock Exchange provides in part as follows:

"Every member organization is required through a general partner, a principal executive officer or a person or persons designated under the provisions of Rule 342(b)(1) to

"(1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.

[and to]

"(2) Supervise diligently all accounts handled by registered representatives of the organization."

Article III, Section 2 of the Rules of Fair Practice of the National Association of Securities Dealers, Inc., provides as follows:

"In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."

These rules and others impose a series of duties upon brokers which may be enforced through SEC enforcement actions and, increasingly, through private actions. While the rules of the NYSE and the NASD set forth duties which, by the language of the rules, appear to sound in negligence, when their breach operates in a manner tantamount to fraud, liability under

Rule 10b–5 may be present. See *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 143 (7th Cir.), *cert. denied*, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969).

The broker/customer relationship is rife with implied representations as to the broker's honesty, diligence and competence. It has been suggested that the failure to comply with the implied representations of due diligence and suitability can constitute a device or scheme actionable under Rule 10b–5. See *Starkman v. Seroussi*, 377 F.Supp. 518, 524 (S.D.N.Y.1974) (Weinfeld, J.) As Judge Timbers wrote, albeit in an enforcement proceeding:

> "Brokers and salesmen are 'under a duty to investigate, and their violation of that duty brings them within the term "willful" in the Exchange Act.' Thus, a salesman cannot deliberately ignore that which he has a duty to know and recklessly state facts about matters of which he is ignorant. . . . The fact that his customers may be sophisticated and knowledgeable does not warrant a less stringent standard." (*Hanly v. SEC*, 415 F.2d 589, 595–96 (2d Cir. 1969) (footnote omitted)).

In this case Dr. Rolf claims that the defendants Stott and BEDCO breached fiduciary duties owed to him by virtue of their position. Rolf also asserts Rule 10b–5 liability for churning, and secondary liability for aiding and abetting. Defendants' primary defense is the trading authorization.

■ Through their witnesses and in their submissions, defendants have argued that the trading authorization executed by Rolf operated to immunize BEDCO and Stott from all liability, and that it relieved them of the various regulatory and fiduciary duties described above. However, despite all these protestations and opinions rendered by the defendants with respect to the matter, the Court must note that defendants have cited absolutely no federal authority to support their argument that the presence of a trading authorization operates to relieve a member firm of its NYSE and NASD duties to its customers.

Rather, as Professor Jacobs has written, "contractual privity is not a *sine qua non* of broker liability." Jacobs, *supra* at 876.

License revocation proceedings before the Securities and Exchange Commission provide the most persuasive authority on the question. In *In re William I. Hay*, 19 S.E.C. 397 (1945), an investment adviser holding a power of attorney engaged in cross-trading and self-dealing, defrauding a number of clients whose stocks were traded through respondent's brokerage house. Further, the adviser bought for his clients large quantities of hopelessly speculative securities. In that proceeding, the brokers asserted the identical defense heard here—that they were fully authorized to accept directions from the adviser, that they never directly advised the clients, and that the power of attorney insulated them from all direct brokerage duties to the clients. The Commission found the argument to be without merit.

Starting from the proposition that the respondent must have known of the adviser's frauds because they were self-evident, the Commission placed upon the brokers a duty of full disclosure to the customer. See 19 S.E.C. at 406–07. Further, the Commission concluded that the brokers had a duty to inform the clients concerning the speculative and financially unsound nature of the investments. The only alternative open to the respondents, the Commission concluded, was to refuse to accept further orders from the adviser.

> "Respondents adopted neither course. The result was that the customers were utterly without protection—served by two agents, one with discretionary power over their account acting faithlessly, and the other a broker, knowing of the faithlessness yet claiming to be free of any duties." (*Id.* at 407).

A similar principle was announced by the Commission a few years later. *In re Moore & Co.*, 32 S.E.C. 191 (1951), involved a situation where the adviser, one Furlong, manipulated the accounts of his clients through one Mrs. Ross, a broker with the respondent firm. Although she had engaged in cross-

trading, simultaneous buying and selling, and other fraudulent transactions at Furlong's direction, the broker testified that she believed the adviser was authorized to engage in such activities. The Commission rejected the notion that Mrs. Ross was relieved of her usual duties as a broker:

"Furlong's power of attorney to deal on behalf of his customers, rather than leading Mrs. Ross to believe, as she contends, that they authorized Furlong's conduct, should have made her realize that he was subject to a high standard of fiduciary responsibility and loyalty with which the transactions in question were on their face inconsistent. Under such circumstances, she could have insulated herself from responsibility only by making the fullest disclosures to his customers or by making certain that his conduct was actually authorized by his customers. She did neither." (32 S.E.C. at 196).

Drawing an inference of willfulness from the circumstances, the Commission determined that the broker's registration should be suspended.

■ Against the rather substantial thrust of these decisions, defendants present only a single case on point, *Carroll v. Doolittle*, 21 Misc.2d 203, 191 N.Y.S.2d 398 (1959). There the state trial court determined that a broker had no state law fiduciary duty to enquire behind the decisions of an investment adviser. This Court is constrained to reject *Carroll* and to accept the view of the Securities and Exchange Commission. While the precedent of SEC actions is not controlling in this civil suit for damages, the Court does find the Commission's decisions persuasive.

■ As the federal agency charged with the multifaceted duties of registration and regulation of broker dealers, as well as with the primary responsibility for enforcement of securities laws designed to protect the investor, the Commission must be afforded the appropriate degree of deference and its administrative judgments accorded great weight. See *SEC v. Chenery Corp.*, 332 U.S. 194, 209, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

In this case there are additional reasons supporting the conclusion that the execution of the trading authorization did not operate to relieve Stott and BEDCO of their usual duties as brokers or to insulate them from liability under the securities laws. Here Dr. Rolf had for six years received from BEDCO the services of an investment adviser and a broker, through the offices of S. Logan Stirling. During that period BEDCO placed Rolf into aggressive but high quality investments. Rolf clearly expected, and the Court concludes he had a right to expect, that BEDCO would continue to exercise some informed judgment on his behalf during the Yamada period. Indeed, during this period Rolf had working for him at BEDCO one of the firm's largest producers, Stott, who had been a branch manager at two different BEDCO offices.

In addition, it was BEDCO, not Yamada, that was a member of the Stock Exchange and of NASD during the period in question. BEDCO, as a large firm in a highly regulated business, was required to implement a series of safeguards to protect its customers. Yamada was associated with no brokerage firm and, as far as the Court is aware, had no direct access to any research department. Despite his credentials and his reputation at the time, Yamada was not in any position and had no express obligation to perform for Dr. Rolf each of the assorted duties imposed upon broker dealers by the NYSE and NASD rules.

■ Further, even if in the abstract a trading authorization relieves the broker from his usual supervisory and due diligence duties, here the conduct of the defendant Stott resulted in his direct participation in the management of the account. While Yamada had the authorization, the Court has found that Stott influenced Yamada's decision-making and recommended to Yamada stocks for Rolf. By these actions, Stott himself pierced the veil of any protection the power of attorney might have given to him or to BEDCO. A broker cannot recommend stocks to an investment adviser at will and then back off and claim

he was no more than an "order taker" when such judgments are challenged.

Finally, the Court notes that defendants are unable to point to any language in the NYSE rules which indicates that the duties of a broker are lessened when an investment adviser handles the account. Indeed, the language of Rule 405(1) which requires the broker to discover all pertinent facts with respect to the adviser indicates to this Court that due diligence is required in this situation also.

Accordingly, under the facts and circumstances herein, and upon the authority of the decisions discussed above, the Court concludes that the execution of the trading authorization in this case did not relieve BEDCO or Stott from their duties to supervise the account and to employ due diligence with respect thereto.

### Churning

When a broker engages in excessive trading in disregard of the customer's investment objectives for the purpose of generating commission business, the customer may hold the broker liable for "churning" the account in violation of Rule 10b–5. See *Carras v. Burns*, 516 F.2d 251, 258 (4th Cir. 1975); *Greenfeld v. D. H. Blair & Co.*, [1975–76] CCH Fed.Sec.L.Rep. ¶ 95,239 (S.D.N.Y.1975). As part of his proof, plaintiff must also demonstrate *scienter*, that is, that the broker acted with intent to defraud or with a willful and reckless disregard for whether his actions constituted fraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1306 (2d Cir. 1973) (en banc); see *Arthur Lipper Corp. v. SEC*, 547 F.2d 171 at 180 (2d Cir. 1976).

To prevail on this claim, plaintiff must show not only that the trading in his account was excessive under the cases, but further that the amount of the trading was unjustified in light of his investment objectives. *Van Alen v. Dominick & Dominick*, 71 Civ. 5438 (S.D.N.Y. December 22, 1976); *Newburger, Loeb & Co. v. Gross*, 365 F.Supp. 1364, 1371 (S.D.N.Y.1973); *Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417, 435 (N.D.Cal.1968), *modified on other grounds*, 430 F.2d 1202 (9th Cir. 1970).

Here the plaintiff has failed to establish the first element of churning, that of excessive trading. During the period of the complaint, the annual turnover rate, even as calculated by the plaintiff, was never any higher than 1.85. This is not excessive under the decisions. See *Van Alen v. Dominick & Dominick, supra; Moscarelli v. Stamm*, 288 F.Supp. 453 (E.D.N.Y. 1968); *Hecht v. Harris, Upham & Co., supra*. Indeed, it is the view of at least one commentator that an annual turnover rate will not be considered excessive unless it begins to approach six. See Note, Churning by Securities Dealers, 80 Harv.L.Rev. 869 (1967).

The Court's finding that the turnover was not excessive is confirmed by the other circumstances present in the case. First, much of the turnover during the year 1969 came as a result of Yamada's liquidation of the Stirling securities, a major overhaul of the account which plaintiff approved. Further, it is clear that plaintiff expected that the proceeds of the liquidation would be used for "trading" rather than for long-term investment. See PX–3. As the foregoing factual discussion indicates, plaintiff's primary goal was capital growth; he was willing to take the risks involved in short-term trading, and he never instructed Yamada not to engage in short-swing trades. Plaintiff's twice-stated investment intent was to double his equity; indeed, in 1969 he expected his equity to double in approximately one year. In brief, the Court concludes that Dr. Rolf was a trader, not an investor, and that he is now estopped from maintaining that there was excessive trading in his account. See *Landry v. Hemphill, Noyes & Co.*, 473 F.2d 365 (1st Cir. 1973).

While the presence of Yamada does not operate to relieve Stott and BEDCO of their duties as brokers, the fact that the adviser made the majority of the investment and trading decisions militates

against any finding that Stott traded the account in order to generate commission business. At trial, Yamada set forth his own reasons for many of the transactions herein, and while Yamada's reasons were not entirely legitimate—involving as they did "free-riding" stock manipulations—it is clear that the trades were not without some investment purpose. Further, Stott did not have exclusive control over the buy and sell decisions, even though he had some influence upon Yamada's decision-making process. A finding that the broker had virtually exclusive control over the trading is a necessary prerequisite to liability for churning. See *Carras v. Burns*, 516 F.2d 251, 258 (4th Cir. 1975); *Greenfeld v. D. H. Blair & Co., supra; Hecht v. Harris, Upham & Co., supra*, 283 F.Supp. at 433; see also *Newburger, Loeb & Co. v. Gross*, [Current Binder] CCH Fed.Sec.L.Rep. ¶ 95,649 (S.D.N.Y. July 8, 1976). Accordingly, the churning claim must be dismissed.

### Rules Violations

Since the Court has concluded that the defendant Stott was not aware of the manipulations in the Rolf account and that Stott did not churn the account, plaintiff's only remaining claims are based upon alleged violations of the NYSE and NASD rules. Accordingly, the Court must enquire into the open question of whether or not an investor may prevail in a private cause of action based upon violations of the regulatory rules.

In *Colonial Realty v. Bache & Co.*, 358 F.2d 178 (2d Cir. 1966), the court concluded that no private cause of action could be brought under the Exchange Act to hold a broker liable in damages for failure to employ "just and equitable" principles of trade, as required by the NASD rules. The court reasoned that such liability would too closely parallel the common law, and that the concept of "just and equitable" principles of trade was so vague and broad that enforcement would be impossible. However, the Second Circuit in *Colonial Realty* did not foreclose the possibility that NYSE or NASD rules might support a federal

securities action in this court; indeed, the court indicated that in considering the question, one must look to the nature of the particular rule and its place in the regulatory scheme. Further, the court stated that the case for implication of a right of action would be strongest where the rule set forth a duty unknown at common law. 358 F.2d at 181–83.

Applying these or comparable principles, a series of decisions have accepted the proposition that in an appropriate case, violations of exchange rules designed for investor protection might give rise to a private cause of action. See *Ocrant v. Dean Witter & Co.*, 502 F.2d 854, 858 (10th Cir. 1974); *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 141 (7th Cir.), *cert. denied*, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969) (NYSE Rule 405 held actionable); *Avern Trust v. Clarke*, 415 F.2d 1238, 1242 (7th Cir. 1969), *cert. denied*, 397 U.S. 963, 90 S.Ct. 997, 25 L.Ed.2d 255 (1970) (NASD rules actionable).

While the parties have not cited, and the Court's research has not found, any reported decision which has held a broker liable solely for the violation of NYSE or NASD rules, a series of district court decisions have accepted the proposition that such liability may lie, and the cases have fashioned the contours of liability for rules violations.

In this district, Judge Weinfeld has expressly held that violations of NYSE rules 345 and 405 are actionable. See *Starkman v. Seroussi*, 377 F.Supp. 518 (S.D.N.Y.1974). Another decision refused to find actionable one NASD rule that imposed the duty to keep proper books, reasoning that the NASD rule, like that considered in *Colonial Realty*, was too vague to be enforceable. *Gurvitz v. Bregman & Co.*, 379 F.Supp. 1283 (S.D.N.Y.1974). Another decision in this district dismissed claims of rules violations where the allegations of the complaint did not set forth a claim of fraud. *Bell v. J. D. Winer & Co.*, 392 F.Supp. 646 (S.D.N.Y. 1975) (Tyler, J.). A recent decision by Judge Newman in the District of Connecticut has concluded that violations of the NYSE and NASD rules are *not* actionable.

*Plunkett v. Dominick & Dominick, Inc.* [Current Binder] 414 F.Supp. 885 (D.Conn. 1976); see also *Zagari v. Dean Witter & Co.* [Current Binder] CCH Fed.Sec.L.Rep. ¶ 95,777 (N.D.Cal. Sept. 27, 1976).

■ The starting point of the analysis is an inquiry into the place which the specific rules occupy in the entire regulatory scheme. In this regard, the Court notes that the Securities and Exchange Commission has enacted regulations comparable to the suitability and the supervisory rules of the NYSE and the NASD; see 17 C.F.R. §§ 240.15b10–3 and 240.15b10–4 (1976); *Plunkett v. Dominick & Dominick, Inc., supra,* 414 F.Supp. at 890 n. 5. With respect to the types of duties imposed by the language of the NYSE and NASD rules themselves, the Court agrees with Judge Weinfeld's reasoning in *Starkman v. Seroussi, supra,* and concludes that NYSE Rule 405 and Article III, Section 2 of the NASD rules are sufficiently precise to sustain a cause of action. Further, there can be no doubt that the purpose of these rules is to protect the investor. Finally, since particularly in this action the duties imposed upon the defendants may be unknown at common law, see *Carroll v. Doolittle, supra,* the Court concludes that this action presents a strong case for the implication of a civil right of action under the NYSE and NASD rules.

Since Rule 10b–5 and 15cl–2 of the Exchange Act are directed essentially at fraud, any definition of what is actionable under NYSE Rule 405 and Art. III § 2 of NASD should be narrowly drawn. See *Hecht v. Harris, Upham & Co., supra,* 283 F.Supp. 417, 430. Indeed, each court that has considered the question has concluded that mere negligent violations of the NYSE or NASD rules are not actionable in federal court; rather, to form the basis for liability in damages, the broker's violations of the rules must be "tantamount to fraud". See *Buttrey v. Merrill Lynch, supra,* 410 F.2d at 143; *Bell v. J. D. Winer, supra; Geyer v. Paine Webber Jackson & Curtis, Inc.,* 389 F.Supp. 679 (D.Wyo.1975) (mere negligence insufficient); *Wells v. Blythe & Co.,* 351 F.Supp. 999, 1001 (N.D.Cal.1973) (rules violations not "per se" actionable); *McCurnin v. Kohlmeyer & Co.,* 347 F.Supp. 573 (E.D. La.1972) (plaintiff must prove at least a knowing and callous disregard for the rules).

■ Accordingly, the Court concludes that under the circumstances of this case, plaintiff may assert a cause of action for violation of the "know your customer" requirement of NYSE Rule 405, and the supervision and suitability requirements of that Rule and of Art. III § 2 NASD and may prevail upon such a claim if he proves by a preponderance of the evidence that the actions of Stott and BEDCO constituted violations of the applicable rules "tantamount to fraud". To meet this standard in this case would mean that the violations operated as a fraud upon the plaintiff and that the defendants acted with *scienter,* that is, with intent to defraud or with willful and reckless disregard for the truth or falsity of their representations or of whether there actions constituted a fraud. See *Lanza v. Drexel & Co., supra* ; see also *Arthur Lipper Corp. v. SEC, supra.*

The Court readily concludes that the actions of the three defendants operated as a fraud upon Dr. Rolf. Initially, the Court has found that Yamada's actions with respect to Delanair operated as a fraud upon the plaintiff. Further, the Court concludes that Yamada's handling of the Rolf account was generally of a fraudulent nature. Indeed, on the facts of this case, the Court has no doubt that the securities purchased by Yamada as a part of his manipulative schemes were unsuitable for the plaintiff. Finally, the complete transformation of the Rolf account from one containing 23 listed issues of reputable quality to an account made up of the likes of Hair Extension Centers, Health Evaluation Systems, and M. H. Studios evidences a breach by Yamada of his investment advisory duties which is doubtless "tantamount to fraud".

■ In such circumstances, where the plaintiff was being disserved by a faithless investment adviser, who was interested in his account only for its "buying power", the

"hand-holding" operation successfully accomplished by Stott was, under the circumstances, a fraud upon the plaintiff.

First, Stott admitted that he never knew plaintiff's investment intent, and that he had no idea what type of investor this customer was when he recommended Yamada to Rolf. These admissions alone could suffice to form the basis of a violation of NYSE Rule 405(1) tantamount to fraud. Contrary to the clear requirements of that Rule, Stott totally failed to learn the essential facts relative to Rolf and Rolf's account. Stott also failed to learn every essential fact relative to Yamada, since he did not learn whether Yamada would be a suitable adviser for Dr. Rolf.

Second, Stott's practice of continually voicing his confidence in Yamada and in Yamada's investment decisions constituted a fraud upon Dr. Rolf, who sincerely believed that Stott had some basis for his statements. The statements of support and the assurances which were repeatedly made were made with willful and reckless disregard for whether they were true or false. While Stott may have had a strong belief in Yamada's money-making abilities, he certainly knew, as the Court has concluded, that Yamada was continuing to invest plaintiff's money in "junk" even after plaintiff had lost three-quarters of a million dollars through such ventures. The evidence is clear that Stott never once recommended that Rolf reconsider any transaction. Stott never recommended against any investment. Stott never suggested to Rolf that perhaps Yamada was too speculative for the plaintiff's investment needs. Stott totally failed to perform the duties placed upon him, as a registered representative and as an employee of a member firm, to take adequate steps to protect the interests of a customer who had entrusted his securities account to BEDCO for six years. Accordingly, the Court concludes that Stott's actions were tantamount to fraud, since they deceived plaintiff into thinking that BEDCO was protecting his interests, and since they operated to help conceal from Rolf the fraud being perpetrated by Yamada.

For the same reasons, the Court concludes that plaintiff has proved by a preponderance of the evidence that Stott acted with the requisite *scienter*. Stott recommended a number of issues for Rolf's account without ever knowing Rolf's investment intentions. He recommended Yamada without any knowledge about plaintiff's account. He continually held Dr. Rolf's hand and assured him, without any basis in fact, that Yamada's decisions were good for Rolf. The Court finds that these factors constitute a knowing, willful and reckless disregard for the truth, a callous and knowing disregard for the requirements of the NYSE and NASD rules involved herein, and proof of the *scienter* element by a fair preponderance of the credible evidence. This conclusion is based upon all the evidence in the case, as well as upon the Court's assessment of Stott's demeanor and credibility.

Even had Stott never assured the plaintiff with respect to Yamada, Stott's total failure to speak out nevertheless would suffice to render him liable for violations of the rules. Stott not only failed to learn about Rolf, but he totally failed to investigate the stocks in the account or to tell Rolf what he now claims—that he really didn't know anything about those stocks. If a broker acts only as an order-taker, he must not offer advice. If he begins to offer advice, he must not fail to make full disclosure. *Carrass v. Burns,* 516 F.2d 251, 258 (4th Cir. 1975). It is apparent that Stott "deliberately closed his eyes to facts he had a duty to see . . . or recklessly stated as facts things of which he was ignorant." *Dlugash v. SEC,* 373 F.2d 107, 109 (2d Cir. 1967).

A broker must not allow his silence to be taken as a recommendation. If he cannot or will not investigate the security being purchased, he must disclose the fact to the customer and warn the customer of the risks of making investments without full knowledge of the issuer. He must satisfy himself that not only the security

but also the type of transaction is suitable for the customer. See *Hanly v. SEC,* 415 F.2d 589, 597 (2d Cir. 1969); *Jacobs, supra* at 887–93. It is apparent that "securities issued by smaller companies of recent origin . . . require more thorough investigation." *Hanly, supra* at 597. Here, Stott testified that he never sent Yamada's speculative investments through BEDCO research to determine whether they were suitable.

For the foregoing reasons, the Court concludes that Stott is liable to the plaintiff in damages for violations of NYSE Rule 405 and Art. III § 2 of the NASD Rules.

### Aiding and Abetting

█ Plaintiff's complaint further asserts that Stott is liable to the plaintiff for aiding and abetting the fraud Yamada perpetrated upon the plaintiff. In order to sustain this claim, the plaintiff must prove that an independent wrong existed, that the alleged aider and abettor had knowledge of the wrong, that he acted with *scienter,* and that he rendered substantial assistance to the primary wrongdoer. *Lowenschuss v. Kane,* 520 F.2d 255, 268 n.10 (2d Cir. 1975); *SEC v. Coffey,* 493 F.2d 1304 (6th Cir. 1974); *H. L. Federman & Co. v. Greenberg,* 405 F.Supp. 1332 (S.D.N.Y.1975); *Rosen v. Dick* [1974–75] CCH Fed.Sec.L.Rep. ¶ 94,786 (S.D.N.Y. Sept. 3, 1974).

█ As the Court has observed above, the plaintiff has proven that Yamada defrauded the plaintiff through the Delanair transaction and that he breached his own fiduciary duties owed to the plaintiff by reason of his investment advisory agreement. These violations were not merely "tantamount to fraud" but rather, constituted a gross fraud. Thus, plaintiff has established an independent wrong by Yamada in violation of Rule 10b–5.

The Court has concluded that Stott knew of the nature of the securities which were being purchased in the account. Stott was aware that Yamada was purchasing highly unsuitable stocks, or "junk", even after such transactions had resulted in the loss of half of plaintiff's money. Even though

Stott did not know of the direct frauds which Yamada was perpetrating on Rolf—such as Delanair—he must have known of the egregious violations by Yamada of the suitability rule. Accordingly, the Court concludes that plaintiff has established Stott's knowledge of the wrongful acts.

For the same reasons as detailed in the previous section, the Court concludes that Stott acted with *scienter;* that is, he made representations to the plaintiff with willful and reckless disregard for their truth, and he acted with a callous and knowing disregard for the requirements of the NYSE and NASD rules.

Finally, there can be little doubt that Stott afforded substantial assistance to the primary wrongdoer Yamada. By continually holding Rolf's hand and assuring him that Yamada's decisions were appropriate, Stott substantially diminished any opportunity for an earlier discovery by Rolf of Yamada's true intentions. By failing to recommend against any venture and by failing to encourage Rolf to question Yamada's suitability as an adviser, Stott contributed to the perpetration of the depletion of Rolf's account and the accumulation of unsuitable securities therein. By trading the stocks through BEDCO with nary a thought as to their suitability or their legitimacy, Stott gave to Yamada what he needed: access to a large portfolio which could be used as a tool in his manipulations. Accordingly, the Court concludes that Stott is liable to the plaintiff for aiding and abetting Yamada's fraudulent violations of his own duties as an investment adviser.

### BEDCO's Liability

█ Plaintiff further asserts that defendant BEDCO is liable for failure to supervise Stott and the Rolf account, either under the doctrine of respondeat superior or as a controlling person liable under Section 20 of the Exchange Act.

Four circuit courts have concluded that a brokerage firm may be liable to a defrauded customer under the common law principle of respondeat superior. See *Holloway*

*v. Howerdd*, 536 F.2d 690 (6th Cir. 1976); *Fey v. Walston & Co.*, 493 F.2d 1036 (7th Cir. 1974); *Lewis v. Walston & Co.*, 487 F.2d 617 (5th Cir. 1973) (Wisdom, J.); *John Hopkins University v. Hutton*, 422 F.2d 1124 (4th Cir. 1970), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974). In this Circuit, two decisions have indicated a growing willingness to hold a brokerage firm liable, at least in enforcement actions, on the basis of the common law principle. See *SEC v. Geon Industries, Inc.*, 531 F.2d 39 (2d Cir. 1976) (Friendly, J.); *SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) (Kaufman, C. J.). *Management Dynamics* expressly disapproved of one district court decision which held respondeat superior inapplicable to a brokerage house, *SEC v. Lums, Inc.*, 365 F.Supp. 1046 (S.D.N.Y.1973). See 515 F.2d at 811–13. Further, it has been suggested that certain language in *Geon Industries, supra*, signals the application of respondeat superior to brokerage firms in damages actions. See *Plunkett v. Dominick & Dominick, Inc., supra*, 414 F.Supp. at 899 (concluding that the common law principle applies).

On the basis of this discussion and the thrust of the cases, this Court concludes that defendant BEDCO is liable to plaintiff under the rule of respondeat superior. There can be no doubt that Stott's actions were within the course of his employment. See *Lewis v. Walston & Co., supra*, 487 F.2d 617 (5th Cir. 1973); Restatement of the Law of Agency (2d) § 229; see also *Goodman v. H. Hentz & Co.*, 265 F.Supp. 440 (N.D.Ill.1967).

The Court also finds BEDCO liable for failure to supervise the account, pursuant to Section 20 of the Exchange Act. The difference between respondeat superior and controlling person liability is "not entirely esoteric" since there is a good faith defense to the latter charge which is unavailable at common law. See *Plunkett v. Dominick & Dominick, supra*.

█ However, here BEDCO's compliance officer stated that all of the firm's control procedures to guard against churning and against unsuitability were jetti-

soned in the face of an investment adviser—any investment adviser. Under the decisions of the SEC in *In re William I. Hay*, 19 S.E.C. 397 (1945) and *In re Moore & Co.*, 32 S.E.C. 191 (1951), the Court concludes that BEDCO's system of supervision during the time in question was wholly insufficient to guard against fraud by the investment adviser or by the broker who was trading for an investment adviser.

"With considerable unanimity, the reported cases have required that to satisfy good faith it must be shown that the controlling person maintained and enforced a reasonable and proper system of supervision and internal control over controlled persons so as to prevent, so far as possible, violations of Section 10(b) and Rule 10b–5." (*Zweig v. Hearst Corp.*, 521 F.2d 1129, 1134–35 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975))

Although BEDCO did not have actual notice of the fraud, its acknowledged policy with respect to the firm's duties where an investment adviser is present, its complete failure to supervise any such accounts, and its laxness which went so far as to permit Stott to recommend an investment adviser with no knowledge of Dr. Rolf's account and even further to allow some *unidentified* person to trade in Rolf's account during April 1969, all lead the Court to the conclusion that BEDCO did not, during the period in question, establish even minimally sufficient safeguards to protect the investor from the type of fraud present in this case. Accordingly, the good faith defense has not been established. See *Barthe v. Rizzo*, 384 F.Supp. 1063 (S.D.N.Y.1974).

### Damages

Plaintiff has established that the acts of the defendants were a substantial or proximate cause of the placing of unsuitable securities in his BEDCO account. Stott's conduct and BEDCO's failure to supervise created a continuous and active potential for harm to the plaintiff, see *Miller v. Schweickart*, 413 F.Supp. 1062 (S.D.N.Y. 1976), and it is clear that plaintiff was

damaged as a proximate result of the defendants' fraud.

However, a persistent damages question in cases such as this one is whether the plaintiff can recover his net losses from the broker who failed in his duties. Having carefully considered the matter, the Court determines that the measure of damages for violation of the suitability and supervision rules should be the same as that applied by the federal courts in awarding damages for churning; i. e., the quasi-contractual theory whereby the defendants are directed to return to the plaintiff all commissions earned and interest paid. See *Hecht v. Harris, Upham & Co.,* 430 F.2d 1202 (9th Cir. 1970); *Stevens v. Abbott Proctor & Paine,* 288 F.Supp. 836 (E.D.Va. 1968).

The Court concludes that it would be inappropriate to award the damages sought by the plaintiff—the net trading losses claimed. Although this measure has been granted by two state court decisions, *Twomey v. Mitchum, Jones & Templeton, Inc.,* 262 Cal.App. 690, 69 Cal.Rptr. 222 (1st Dist. 1968) and *Pierce v. Richard Ellis & Co.,* 62 Misc.2d 771, 310 N.Y.S.2d 266 (Civil Ct.N.Y.Cnty.1970), the Court is unaware of any federal court which has ever applied this damage theory. Further, both *Twomey* and *Pierce* involved unsuitability *and* churning; only the former is present here. The *Pierce* decision has not been followed by the New York courts, see *Lehman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* (Sup.Ct.N.Y.Cnty. Feb. 24, 1976), and this Court finds itself in agreement with the criticism of the *Twomey* case set forth in *Stevens v. Abbott, Proctor & Paine, supra,* 288 F.Supp. 836, 849.

Since much of the damage suffered by the plaintiff here was as a result of poor investment decisions and as a result of a bear stock market (see DX–WW, DX–XX), it would be highly inappropriate to allow plaintiff to recover all his losses by assessing them against Stott and BEDCO. A much more logical measure of damages is to require the defendants to return all the benefit which they received, since they failed to give to plaintiff the consideration due him—supervision and diligence as to the account. Under the circumstances of this case, all other measures of damage are rejected as wholly speculative with respect to actual injury found by the Court to have been caused by the defendants' actions.

Plaintiff's complaint alleges that during the period in question, the defendants were paid by plaintiff commissions in the amount of $42,341.80 and interest on the margin account of $13,448.20. These figures were mentioned by the various witnesses at trial, and the sums are compiled from BEDCO statements (PX–12, PX–13, PX–14). The Court considers an award of commissions and margin account interest to be proper in this case, since it restores to the plaintiff all monies paid to the defendants Stott and BEDCO during the period in question.

Plaintiff also makes a post-trial claim for punitive damages, but the Court declines under the circumstances to grant such an application. First, there is no dispute that plaintiff's complaint set forth no cause of action under state law; despite the decisions cited by the plaintiff, see *Henry v. United States,* 424 F.2d 677 (5th Cir. 1970), the Court would not be willing to grant an application to amend the pleadings at this late date. In any event, the point is academic since the Court does not find that an award of exemplary damages should be granted in this case.

First, there is substantial doubt as to whether a plaintiff can ever receive punitive damages for violations of federal securities laws. See *Green v. Wolf Corp.,* 406 F.2d 291 (2d Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Myzel v. Fields,* 386 F.2d 718 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). Even assuming that there was no procedural or statutory obstacle to the grant of punitive damages, the Court would not make such an award based upon the rationale stated by the Court in *Stevens v. Abbott, Proctor & Paine, supra* :

"The Court finds that the conduct engaged in in the instant case results from

the failure of the defendants to abide by their legal responsibilities, but finds no reason to believe that by awarding exemplary or punitive damages, actions in the future similar to those which give rise to the instant suit would be any more deterred than by virtue of the fact that the suit itself has accomplished that very result." (288 F.Supp. 836, 848)

Accordingly, plaintiff shall recover commissions and interests paid on the margin account, plus interest from the date of the entry of judgment herein. See *Stevens v. Abbott, Proctor & Paine, supra.*

### The Cross-Claims Against Yamada

■ The Court concludes that a broker and his employer should not be permitted to receive indemnity from the customer's investment adviser where the broker and his firm have failed in their duty to protect the interests of the customer, in violation of NYSE and NASD rules and in violation of Rule 10b–5. To allow indemnity in this case would be to encourage flouting the policy of the securities laws. See *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1288 (2d Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). Accordingly, the cross-claims against Yamada are dismissed.

### Conclusion

Judgment should be entered for the plaintiff David E. Rolf against defendants Blyth Eastman Dillon & Co., Inc., and Michael Stott for damages in the amount of $55,790.00 plus interest from the date of judgment, in accordance with the decision of the Court herein. Judgment should further be entered dismissing plaintiff's claims against the defendant Akiyoshi Yamada in accordance with the stipulation and order entered at the conclusion of trial, and dismissing the cross-claims of defendants BEDCO and Stott against Yamada. Counsel for the plaintiff is directed to submit an appropriate order of judgment on three days' notice.

SO ORDERED.