637 F.2d 77
 Fed. Sec. L. Rep. P 97,711
David E. ROLF, Plaintiff-Appellant-Cross-Appellee,
v.
BLYTH, EASTMAN DILLON & CO., INC., and Michael Stott,
Defendants-Appellees-Cross-Appellants.
 Nos. 9, 133, Dockets 80-7130, 80-7164.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 8, 1980.
Decided Dec. 1, 1980.
 
 Sidney B. Silverman, New York City (Joan T. Harnes, Martin H. Olesh, Silverman & Harnes, New York City, on the brief), for plaintiff-appellant-cross-appellee.
 Thomas W. Kelly, New York City (Robert R. Elliott, III, Breed, Abbott & Morgan, New York City, on the brief), for defendants-appellees-cross-appellants.
 Before FEINBERG, Chief Judge, and FRIENDLY and OAKES, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This appeal is another chapter in the litigation initiated by appellant David E. Rolf, an investor in the stock market, to recover damages for losses suffered in connection with the handling of his portfolio by appellants Blyth, Eastman Dillon & Co., Inc. (BEDCO), a brokerage firm, and Michael Stott, one of the firm's registered representatives. When this case was previously before us, we upheld the judgment of the United States District Court for the Southern District of New York, Lawrence W. Pierce, Judge, as to appellees' liability for aiding and abetting the securities fraud perpetrated by Akiyoshi Yamada, Rolf's investment advisor. We remanded, however, for an assessment of damages in accordance with guidelines that we set forth. Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2d Cir.), cert. denied, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) (Rolf II ). All parties now appeal the two subsequent lower court decisions on the damage issue, see Rolf v. Blyth, Eastman Dillon & Co., No. 73 Civ. 2967 (S.D.N.Y. Jan. 8, 1980) (Rolf IV ); Rolf v. Blyth, Eastman Dillon & Co., (1979 Transfer Binder) Fed.Sec.L.Rep. (CCH) P 96,919 (S.D.N.Y.1979) (Rolf III ).
 
 
 2
 Rolf, the plaintiff below, claims error in the district court's holding that Stott's aiding and abetting activities did not commence until January 31, 1970. Rolf contends that if the court below had applied the correct legal standard to the facts, it would have found that aiding and abetting began at the latest at the time of the purchase of Delanair, a restricted stock. Rolf authorized payment for the Delanair stock on July 31, 1969, see generally Rolf v. Blyth, Eastman Dillon & Co., 424 F.Supp. 1021, 1031 (S.D.N.Y.1977) (Rolf I ). Rolf further claims that the court below erroneously computed his damages when it reduced them by $175,000, the amount of cash that he received in settlement of his claims against certain Delanair-related defendants, but failed to take into account the value of the Delanair stock which he surrendered in the settlement. Finally, Rolf asserts that the trial court erred in again denying him prejudgment interest, a matter we had asked the district court to reconsider, Rolf II, 570 F.2d at 50.
 
 
 3
 BEDCO and Stott, in addition to disputing each of Rolf's points, appeal on the ground that the court below erroneously declined to grant them credit for net withdrawals of cash and securities by Rolf during the aiding and abetting period. BEDCO and Stott also suggest, though they recognize that the law of the case is to the contrary, that the dissenting opinion in the earlier appeal was correct and, accordingly, that they should be relieved of liability.
 
 
 4
 We agree with each of Rolf's conclusions, though by no means with all of his reasoning. We disagree with the arguments made by BEDCO and Stott, but we recognize that our previous opinion did not correctly set forth the proper method for ascertaining damages and that this was to their detriment. We therefore remand for further proceedings in accordance with this opinion.
 
 I. BACKGROUND
 A. Our Previous Opinion
 
 5
 In our previous opinion we found Stott liable under section 10(b) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, for aiding and abetting by a reckless fiduciary.[1] We held that the following factual and legal conclusions established an aiding and abetting violation by Stott: (1) Yamada, the primary party, committed a securities law violation by his overall fraudulent mismanagement of Rolf's account, Rolf II, 570 F.2d at 47; (2) Stott's reckless conduct, as exemplified by his constant reassurances to Rolf "without investigation and with utter disregard for whether there was a basis for the assertions," satisfied the requirement of scienter, id. at 47-48; and (3) Stott rendered substantial assistance to Yamada in the fraudulent mismanagement of Rolf's portfolio by, among other things, engaging in a "hand-holding operation" to prevent Rolf from discovering Yamada's fraud, id. at 48.
 
 
 6
 We should point out, however, that on petition for rehearing we amended our opinion by adding footnote 16A. This footnote was entered by order dated May 22, 1978 and, although it does not appear in the Federal Reporter, it is printed in the CCH Federal Securities Law Reporter. The added footnote reads as follows:
 
 
 7
 This decision does not impose liability on a broker-dealer who merely executes orders for "unsuitable" securities made by an investment advisor vested with sole discretionary authority to control the account. In the present case, the broker-dealer, although charged with supervisory authority over the advisor and aware that the advisor was purchasing "junk," actively lulled the investor by expressing confidence in the advisor without bothering to investigate whether these assurances were well-founded.
 
 
 8
 (1978 Transfer Binder) Fed.Sec.L.Rep. (CCH) P 96,525, at 94,069 (2d Cir. May 22, 1978).
 
 
 9
 After affirming the finding of aiding and abetting liability, we remanded for ascertainment of damages. We instructed the district court, first, to determine as near as possible the time when Stott began to aid and abet Yamada's fraud and compute the market value of Rolf's portfolio on that date, and second, to subtract from this market value figure the value of the portfolio when Stott's participation ceased, thereby ascertaining Rolf's "gross economic loss" during the aiding and abetting period. Rolf II, 570 F.2d at 49 & n.21. We then indicated that the district court should reduce Rolf's gross economic loss by a "well recognized index of value, or combination of indices," so as to take into account the overall decline in the stock market during the period of aiding and abetting.[2] Id. at 49. It should be noted that we left it up to the district court to "select a more appropriate gauge" in the event that "a broad-based index would not be representative" of the stocks in Rolf's portfolio at the commencement of the aiding and abetting period, id. at 49 n.22.
 
 
 10
 We went on to refer specifically to the loss on the Delanair stock and stated that in the event that losses occurred during the aiding and abetting period, Rolf's damages "must be reduced by $175,000, the amount for which he settled his claims against several Delanair-related defendants." Id. at 49-50. We also held that Rolf was entitled to a return of commissions paid to BEDCO and Stott for transactions during the aiding and abetting period. And we requested the district court to reconsider its decision on the question of prejudgment interest "in view of our obvious conclusion that Rolf was deprived of a principal sum." Id. at 50.
 
 B. The Trial Court Decisions on Remand
 
 11
 On remand Judge Pierce first determined the date on which Stott began to aid and abet Yamada's fraud. Even though Yamada sold a substantial portion of Rolf's original portfolio during the summer of 1969, Judge Pierce rejected June or July 1969 as beginning dates for Stott's aiding and abetting liability because it was reasonable for a new investment advisor to start with a clean slate and because the judge "(was) not persuaded that prior to September 1969 Stott actually knew of Yamada's fraudulent intentions toward Rolf's account or that his conduct prior to that date was so reckless as to constitute the requisite scienter...." Rolf III, (1979 Transfer Binder) Fed.Sec.L.Rep. (CCH) P 96,919, at 95,855. This latter statement suggests that Stott's conduct did become sufficiently reckless to satisfy the scienter requirement by September 1969, but the judge ultimately determined that Stott's liability began on January 31, 1970, when "the fraud was so obvious that Stott should have been aware of it and any failure to obtain more specific knowledge constituted 'reckless disregard,' " id. at 95,856. As for the date on which Stott's aiding and abetting ceased, all parties agreed that this occurred on January 21, 1971, when the account was shifted from Stott to another BEDCO broker, id. at 95,855.
 
 
 12
 After further submissions by the parties, Judge Pierce then went on to find that the market value of Rolf's portfolio, based on closing "bid" prices on January 30, 1970, and exclusive of Delanair securities, was $357,140.99. Rolf IV, No. 73 Civ. 2967, at 3. He ruled that the January 30, 1970 bid price of $3 per share for the Delanair stock (100,000 shares of which were originally purchased in the summer of 1969 at a price of $337,500) should be reduced by 20% because of the restricted nature of the stock. This left the value of the Delanair securities at $240,000 and gave Rolf's portfolio a total market value of $597,140.99 on January 31, 1970.[3] Id. at 4-5. Next, Judge Pierce calculated the value of the portfolio as of January 21, 1971 to be $211,129.98,[4] producing a gross economic loss of $386,011.01, of which $170,000 was attributable to the decline in the value of Delanair. Id. at 5-6.
 
 
 13
 In accordance with instructions in our opinion,[5] Judge Pierce reduced Rolf's gross economic loss by the percentage decline in an appropriate price index. He chose to apply Standard & Poor's Low Priced Common Stocks index (Low Priced index) because in only four instances did the price of the shares in the portfolio on January 31, 1970 exceed $20. Using the Low Priced index, the judge reduced the gross economic loss by 7.5%, leaving an adjusted gross economic loss of $357,021.58. Id. at 6-7. He further modified this figure by taking into account Rolf's settlement with several Delanair-related defendants, lowering the damages by $157,233[6] to produce a final net loss of $199,788.58. Id. at 7-8. Judge Pierce also awarded Rolf a sum equal to commissions charge during the aiding and abetting period, $5,132.27, and interest on that sum calculated at an annual rate of 7%. Id. at 8. However, he denied prejudgment interest on the damages on the grounds that BEDCO and Stott were not primary wrongdoers, that BEDCO did not have actual notice of the fraud, and that the evidence of wrongdoing presented by Rolf was "not so overwhelming as to warrant an award of prejudgment interest." Id. at 8-9.
 
 
 14
 Rolf contended below that the court was mistaken in its view of the gain he received from the Delanair settlement because the court failed to take into account the fact that the settlement required Rolf to transfer his remaining shares of Delanair stock to the settling parties, which offset the $175,000 payment by the value of these stocks.[7] Judge Pierce, noting that this "should have been raised before the Circuit Court," declined to reach the issue. Id. at 10 n.1. The judge also refused to follow the suggestion of BEDCO and Stott that he deduct from Rolf's damage award cash and securities withdrawals made by Rolf from the BEDCO account during the period in question. Id. at 10 n.2.
 
 II. DISCUSSION
 
 15
 A. The Date of Commencement of Stott's Aiding and Abetting Liability
 
 
 16
 The task of the district court in determining when Stott's aiding and abetting liability commenced was to apply the legal standard delineated in our previous opinion to the facts of this case. That determination, therefore, comes to us as a mixed finding of law and fact subject to full review, see Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774, 776-77 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966). We disagree with the trial court's selection of the January 31, 1970 date, finding instead that Stott's reassurances to Rolf in the summer of 1969 about the propriety of the Delanair purchase mark the proper point for the commencement of liability.
 
 
 17
 The district court was quite correct in rejecting the May to June 1969 period, during which Yamada liquidated a large portion of the Rolf portfolio, as the beginning date of Stott's aiding and abetting. Even though Stott earned substantial commissions during this period, and perhaps recommended some of the purchases because of family connections to two companies, see Rolf I, 424 F.Supp. at 1029, we still agree with the district court that because it was not unusual to have a new investment advisor make a clean break, the early summer date is inappropriate. In fact, the sale of the stocks, at least, turned out to have been wise, as the market subsequently declined.
 
 
 18
 On the other hand we cannot agree with the district court that the date aiding and abetting began was as late as January 1970. By June of 1969 Yamada had made substantial investments for Rolf in Monarch Industries, an obscure, low-quality stock, which ultimately cost Rolf some $159,000, id. at 1032. Of course, every investment advisor makes mistakes, and Stott's failure to investigate this purchase was not so reckless as to constitute the requisite scienter, especially in light of Rolf's expressed hopes for rapid growth of his portfolio and Yamada's widely-recognized reputation for brilliance. However, when Yamada persuaded Rolf to buy Delanair, it was no ordinary purchase.
 
 
 19
 The Delanair purchase involved $338,000, almost 24% of the value of Rolf's portfolio as of May 9, 1969, the date Yamada became his investment advisor. Not only was this an extraordinary commitment but it was in a stock in which BEDCO would not even trade because of a house rule against soliciting stocks selling at less than $5 per share, Rolf I, 424 F.Supp. at 1030-31. More importantly, the stock was restricted and it was not listed in either Moody's Manuals or Standard & Poor's Security Owner's Stock Guide. As Rolf's expert testified, Delanair was the "lowest of the low." Id. at 1032.
 
 
 20
 Rolf was quite concerned about the purchase and he called Stott before his funds had been committed. According to the district court, "Stott stated that if Yamada had recommended the transaction, then it must be okay; in effect, Stott said to go through with it." Id. at 1031. Stott gave this assurance without making any investigation; Stott himself claimed at trial below, he "really didn't know anything" about Delanair. Id. at 1042. In the words of our added footnote, Stott "although charged with supervisory authority over (Yamada) and aware that (Yamada) was purchasing 'junk' (Delanair), actively lulled (Rolf) by expressing confidence in (Yamada) without bothering to investigate whether (his) assurances were well-founded."
 
 
 21
 The record before us does not disclose the precise date on which Stott reassured Rolf about Delanair, although it seems that it must have been in July 1969.[8] Stott, by providing reassurance at that time, without making any investigation, acted so recklessly as to be charged with scienter. We accept July 31, 1969 as the date of commencement of Stott's liability because that was when Rolf committed his funds to the Delanair purchase the date on which the damage, so to speak, was done.
 
 B. The Computation of Damages
 
 22
 In our previous opinion we instructed Judge Pierce to reduce Rolf's gross economic loss by the percentage decline in value of some well recognized index, or a composite of indices, during the period of Stott's aiding and abetting. We explained that if during the relevant period the stock market declined in value by a certain percentage then Rolf's gross economic loss should be reduced by that percentage. Rolf II, 570 F.2d at 49. This calculation, however, would allow Rolf too great a recovery. The proper method of determining damages is to take the initial value of the portfolio, adjust it by the percentage change in an appropriate index during the aiding and abetting period, and subtract the value of the portfolio at the end of the period. For example, if the initial value of the portfolio is $1,000, the end value $600, and the index chosen fell 10%, then under the formula given in our previous opinion Rolf's gross economic loss of $400 would be reduced by 10% to give him a damage award of $360. But if no fraud had been committed his portfolio would have declined by 10% anyway to $900 and thus his loss resulting from the fraud would actually have been only $300 ($900 minus $600), rather than $360. Two case comments called this point to our attention, see 83 Dick.L.Rev. 175, 181 & n.40 (1978); 66 Geo.L.J. 1551, 1570-71 (1978). The calculation should be corrected on remand accordingly.
 
 
 23
 Turning to the index factor, Rolf argues that the district court erred in using Standard & Poor's Low Priced index. Rolf had urged the court below to use Standard & Poor's Industrial Stocks index, claiming that the securities in that index were most comparable to those in his portfolio.[9] He based his argument on the fact that Standard & Poor's Industrials consists of common stocks of 400 companies which are in various industrial groups, and his portfolio, at least as of January 31, 1970, consisted of common stocks of nine issuers identified as industrials. Moreover, the primary criterion for inclusion of an issue in the Low Priced index is that it have a price of approximately $10 per share or less. Rolf's portfolio, again as of January 31, 1970, contained five out of ten issues priced from $15 to $45 per share.[10] Nevertheless, the vast majority of the shares of stock comprising Rolf's portfolio were priced at or below $10 and, therefore, it was well within the discretion of the district court to refer to the Low Priced index for the period in question. We leave it to that court on remand to determine whether the new date for beginning the aiding and abetting period will affect the choice of the index.C. The Delanair Settlement
 
 
 24
 In Rolf's main brief on the prior appeal, he conceded that the $175,000 obtained in the Delanair settlement "should be credited to the defendant since that amount was recovered by plaintiff." Brief for Plaintiff-Appellant-Cross-Appellee at 40-41. It was on the basis of this statement that we instructed the district court to reduce Rolf's damages by $175,000 if the Delanair loss occurred, as it did, during the aiding and abetting period. Rolf II, 570 F.2d at 49-50. It now appears, however, that in 1973 when Rolf settled with the other Delanair defendants, he transferred his Delanair stock to the settling defendants as part of the agreement. Although the record provides no indication of the value of the Delanair stock at the time of the settlement,[11] we see no reason why, even at this late date, the district court cannot determine that amount and deduct it from the $175,000 in order to arrive at the true value of the settlement to Rolf. The court should then use only this net figure in reducing that part of Rolf's damage award related to the Delanair holdings.
 
 
 25
 D. Rolf's "Withdrawals" of Cash and Securities
 
 
 26
 BEDCO and Stott argue that the lower court should have granted them a credit against the damage award for net withdrawals of cash and securities by Rolf during the aiding and abetting period. In principle, they are correct that Rolf is entitled to recover only for his actual losses. Case law supports this proposition, as did our own caveat that the damage computations "cannot restore a plaintiff to a better position than he would have been in if the fraud had not occurred," Rolf II, 570 F.2d at 49 n.22. See Richardson v. MacArthur, 451 F.2d 35, 44 & n.13 (10th Cir. 1971); Esplin v. Hirschi, 402 F.2d 94, 105 (10th Cir. 1968), cert. denied, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969); Abrahamson v. Fleschner, 392 F.Supp. 740, 745-46 (S.D.N.Y.1975), aff'd in part, rev'd in part, 568 F.2d 862 (2d Cir. 1977), cert. denied, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978); see also section 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a). To be sure, as the district court said on remand, we did not direct a transaction-by-transaction analysis. But we also made it very clear that "(w)e (were) not capable of precisely measuring Rolf's damages on this appeal," Rolf II, 570 F.2d at 48. Once the facts necessary to make such a measurement have been determined, it is incorrect simply to disregard the withdrawals as immaterial.
 
 
 27
 At the same time, if Rolf's version of the individual transactions is correct, then at least during the period of time considered by the district court, it may well be that BEDCO and Stott are not entitled to any credits. Indeed, they do not deserve such credits if Stott played a role in the purchases of securities or other interests by Rolf with the funds from the withdrawals[12] and if the value of these purchases is included in Rolf's holdings at the end of the aiding and abetting period. To be more specific, BEDCO and Stott point to a series of cash withdrawals and offsetting cash deposits as follows:BEDCO and Stott then claim that they therefore should be credited with Rolf's net withdrawal of $67,497.68 in cash. Brief for Defendants-Appellees-Cross-Appellants at 37-38. But Rolf asserts that BEDCO and Stott are tied to the subsequent purchases related to these withdrawals and thus are not entitled to any such credit. Reply Brief for Plaintiff-Appellant-Cross-Appellee at 47-51.
 
 
 28
 For example, the $55,421.78 withdrawn on March 9, 1970 was used, according to Rolf, to buy Delanair warrants. Although this transaction could not be effected through BEDCO because of the highly speculative nature of the security, Stott sanctioned the Delanair deal, Rolf I, 424 F.Supp. at 1030-32, and the district court included the value of Delanair in the January 21, 1971 portfolio. Similarly, Rolf claims that the withdrawal on March 12, 1970 of $2,075.90 was for payment of the Canadian tax on West Coast Petroleum, a stock that was in Rolf's portfolio at Stott's behest. As for the September 2, 1970 withdrawal of $10,000, it was followed by a deposit on September 3, 1970, representing simply a bookkeeping transfer in the BEDCO firm. Finally, Rolf claims that withdrawals listed on August 25, 1970, and September 21, 1970, totaling $15,000, were used for highly speculative securities purchased outside BEDCO but deposited with it,[13] thus keeping the funds within the overall fraud.
 
 
 29
 Withdrawals of securities may, in large part, be similarly explained. Rolf says that he used the $70,800 in proceeds from a withdrawal and sale of 9,600 shares of Monarch to purchase a partnership share in Seijo Associates, a group with which Yamada's family was involved. Rolf testified that Stott had specifically advised him to proceed with this purchase by stating: "Oh, yes, if he has his family in there, you know, he is a bright guy and he will do all right."[14] As for the other 200 shares of Monarch withdrawn on December 1, 1970, we do not know what might have happened, but it should not be difficult for the district court to determine whether these were converted into other securities included in the closing January 21, 1971 holdings. If they were not and Rolf simply used the proceeds for his own purposes, then he is not entitled to double recovery, and BEDCO and Stott should receive an appropriate credit. On remand the district court should be able to resolve this entire matter of withdrawals and credits rather readily on a transaction-by-transaction basis.
 
 E. Prejudgment Interest
 
 30
 We previously asked the district court to reconsider its denial of prejudgment interest in view of our conclusion on appeal that Rolf had been deprived of a principal sum. Rolf II, 570 F.2d at 50. The district court on remand again declined to award interest to Rolf on the grounds that BEDCO was merely vicariously liable and had no actual notice of the fraud involved, and that Stott was not the primary wrongdoer but merely an aider and abettor against whom the evidence was "not so overwhelming." Rolf IV, No. 73 Civ. 2967, at 8-9. We realize that an award of prejudgment interest is a matter of judicial discretion, but we are perplexed by the district court's reasoning.
 
 
 31
 If our legal standard is correct for aiding and abetting liability under section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder, as we believe it is,[15] then the evidence in this case was quite substantial. Stott considered many of Yamada's purchases to be "junk," and even told this to Yamada, yet Stott never mentioned this fact to Rolf or cautioned him against any investments. Instead, in the words of the district court, "(Stott) continually held Dr. Rolf's hand and assured him, without any basis in fact, that Yamada's decisions were good for Rolf.... Stott not only failed to learn about Rolf, but he totally failed to investigate the stocks in the account...." Rolf I, 424 F.Supp. at 1042. Thus, we cannot accept as sound the district court's reasoning in again denying prejudgment interest.
 
 
 32
 An award of prejudgment interest is in the first instance, compensatory, and is customary in cases involving a breach of fiduciary duties. See Norte & Co. v. Huffines, 416 F.2d 1189, 1191 (2d Cir. 1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970). Rolf has not had the use of the principal sum in the nine years since Yamada defrauded him with Stott's assistance. In view of the high inflation rates that beset this period, a damage award without prejudgment interest (or, indeed, even one that does include it) would not give Rolf full compensation for the losses he suffered at the hands of his fiduciary.
 
 
 33
 In addition to the compensatory principle, awards of prejudgment interest are governed by fundamental considerations of fairness. Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962); Norte & Co. v. Huffines, 416 F.2d at 1191. Here there was no evidence of dilatory tactics on the part of the plaintiff and the fact that the defendants were not unjustly enriched does not, standing alone, make it inequitable to compel them to pay interest. Given the absence of any showing of unfairness to Stott and BEDCO, justice requires the running of prejudgment interest from the end date of their liability on January 21, 1971. The annual interest rate should be the same as that used by the district court in connection with the award of damages for commissions, namely 7%.
 
 F. The Cross-Appeal
 
 34
 BEDCO and Stott again seek to challenge Stott's liability as a reckless fiduciary aiding and abetting Yamada.[16] This matter, which was the subject of a petition for rehearing en banc before our court as well as a petition for certiorari before the Supreme Court, is controlled by "the law of the case." Although we have many times said that the doctrine of the law of the case is not an inexorable demand but a rule of practice, see, e. g., Slotkin v. Citizens Casualty Co., 614 F.2d 301, 312 (2d Cir. 1979), cert. denied, --- U.S. ----, 101 S.Ct. 395, 66 L.Ed.2d 243 (U.S. Nov. 11, 1980) (No. 79-1524); LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266, 274 (2d Cir.), cert. denied, 382 U.S. 878, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965); Dictograph Products Co. v. Sonotone Corp., 230 F.2d 131, 135 (2d Cir.), cert. dismissed, 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956), we think it a sound rule and a most appropriate one to apply to our earlier determination of aiding and abetting liability.
 
 
 35
 We therefore affirm the judgment of the court on the cross-appeal, but reverse and remand on the principal appeal for reconsideration and findings in accordance with this opinion.
 
 
 
 [1]
 BEDCO had conceded "for purposes of this appeal" that if we found Stott liable, BEDCO would be vicariously liable under section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a). Rolf II, 570 F.2d at 41, 48 & n.19. BEDCO takes the same position in the instant appeal. Brief for Defendants-Appellees-Cross-Appellants at 46
 
 
 [2]
 As we make clear below, in part II. B. of the opinion, our instructions erroneously stated the novel formula that we intended to adopt for ascertaining damages in this type of case
 
 
 [3]
 The portfolio as of January 31, 1970 consisted of:
 Number Bid Market
of Shares Security Price Value
 2,000 Benguet Consol. Corp. $ 10.00 $ 20,000.00
 1,000 Equity Funding Corp. 45.00 45,000.00
 1,000 Outlet Co. 15.625 15,625.00
 1,000 Simplex Wire & Cable 32.75 32,750.00
 1,000 Food Fair Properties 4.375 4,375.00
 2,000 Holobeam, Inc. 24.75 49,500.00
 9,800 Monarch Indust., Inc. 9.50 93,100.00
 3,500 Synchronex Corp.
 Class A Common 22.50 78,750.00
 4,000 West Coast Prod. Co. 10.00 40,000.00
 ------------
 Subtotal $379,100.00
 Less Margin Account Debit Balance (21,959.01)
 ------------
 Value of Portfolio (without
 Delanair securities) $357,140.99
 Delanair was valued at 240,000.00
 ------------
 Total Value $597,140.99
 
 
 [4]
 The portfolio as of January 21, 1971 consisted of:
 Number Bid Market
of Shares Security Price Value
 2,000 Benguet Consol. Corp. $ 7.75 $ 15,500.00
 2,500 Fire Fly Enterprises 5.00 12,500.00
 2,500 G.P.I. Enterprises 16.00 40,000.00
 3,000 Hair Extension Center .25 750.00
 1,200 Holobeam, Inc. 6.625 7,950.00
 3,000 Int'l Health Sciences 4.875 14,625.00
 900 Simplex Wire & Cable 19.50 17,550.00
 3,500 Synchronex Corp.
 Class A Common 5.00 17,500.00
 2,200 Visual Sciences, Inc. 10.00 22,000.00
 100,000 Delanair, Inc. .875 70,000.00
 ------------
 Subtotal $218,375.00
 Less Margin Account Debit Balance (7,245.02)
 ------------
 Value of Portfolio $211,129.98
 In determining the market value of the Delanair stock, Judge Pierce again reduced Delanair's bid price by 20%.
 
 
 [5]
 See note 2 supra
 
 
 [6]
 In 1973 Rolf settled with several Delanair-related defendants other than BEDCO and Stott for $175,000. Rolf I, 424 F.Supp. at 1032. We instructed the district court to take this settlement into account so as to avoid granting Rolf a double recovery for the fraud related to Delanair. Rolf II, 570 F.2d at 49-50. Let us assume for the moment, as we had believed up until now, that $175,000 represented the true value of the settlement. Judge Pierce, then, properly noted that it would be incorrect simply to subtract this amount from Rolf's damage award, as this would not isolate damages related to Delanair from damages related to other stocks in the portfolio. Instead, he reduced that portion of Rolf's damages attributable to the Delanair stock by up to $175,000
 First, the judge calculated the gross economic loss due solely to Delanair $170,000. Then he reduced this amount by the decline in the price index, leaving an actual loss due to the Delanair fraud of $157,233. Because this actual loss was less than the settlement value, Judge Pierce subtracted only the actual loss ($157,233) from Rolf's damages. To subtract more would have unfairly reduced Rolf's damages for the aiding and abetting related to other stocks in his portfolio.
 Although Judge Pierce flawlessly applied this methodology at the time he calculated the damage award, his result was incorrect because it now appears that the price index was misused, see part II. B. of this opinion, and that the Delanair settlement value was overstated, see part II. C. of this opinion and note 7 infra.
 
 
 [7]
 Judge Pierce placed a value of $70,000 on the Delanair securities as of January 21, 1971. Rolf claimed, in effect, that the court should reduce the $175,000 deduction from damages by the value of his Delanair stock as of that date, which he now lists as $75,000. Brief for Plaintiff-Appellant-Cross-Appellee at 82. Regardless of how one might resolve this intentional or inadvertent $5,000 discrepancy in figures, any reduction of the $175,000 should be done by the value of the Delanair securities at the time of the settlement in March 1973, and not as of January 21, 1971, the end of the aiding and abetting period. In this manner, the real value of the settlement at the time that it was reached can be determined and subtracted from Delanair-related damages
 
 
 [8]
 The district court found that Rolf had telephoned Stott after he had spoken with Yamada about Delanair, but before the funds had been committed. Rolf I, 424 F.Supp. at 1031. A letter from Rolf to Stott, dated July 31, 1969, and introduced into evidence below, authorized the purchase of Delanair. It appears, therefore, that Stott must have reassured Rolf about Delanair at some point in July 1969
 
 
 [9]
 Standard & Poor's Industrial Stocks index actually increased some 9.79% between January 31, 1970, and January 21, 1971, while Standard & Poor's Low Priced index declined 7.5%
 
 
 [10]
 See note 3 supra
 
 
 [11]
 See note 7 supra
 
 
 [12]
 Naturally, if Rolf purchased new securities on his own without any assurances from Stott, then Stott could not be liable for a decline in the value of the securities
 
 
 [13]
 BEDCO and Stott admit that 1,000 shares of Tranquilaire Mental Health worth approximately $6,525 and 2,000 shares of GPI Enterprises worth $10,000 were purchased elsewhere and transferred to BEDCO on August 25, 1970 and September 21, 1970, respectively, Brief for Defendants-Appellees-Cross-Appellants at 40, dates which correspond to those for withdrawals of cash
 
 
 [14]
 Rolf claims that Seijo was a worthless hedge fund. If that is the case, then Seijo had no value to be included in the January 21, 1971 holdings. Otherwise, its value must be included in order to avoid an excessive recovery
 
 
 [15]
 Student commentators have disagreed, see 7 Fla.St.U.L.Rev. 139 (1979); 83 Dick.L.Rev. 175 (1978)
 
 
 [16]
 See note 1 supra