**BEAR, STEARNS & CO.,** a Delaware corporation; **Bear Stearns Securities Corp.,** a Delaware corporation; **Stephen Ackerman; Barry Ganz; and Mark Seruya, Petitioners,**

v.

John **BUEHLER, The Conner Living Trust, Lloyd Connor, Trustee, Jeremiah "Toby" Crowley, Melissa Crowley, Kenny Danielson, Barbara Danielson, Katherine H. Everson, Chester G. Fisher, II, James Fisher, Richard N. Gaines, Richard N. Gaines Pension Plan, Rebecca Gonzalez, Wallace Green, Thelma Green, Theodore Harris, Mary Lou Harris, Lois M. Healy, Carlton Jones, Shirley Jones, Eliza-**

---

beth Anne Mckenzie, Donald Mcken-zie, Richard and Agnes Meyers Estate, James Mitchell, Ann Pereos a.k.a. Ann Fry, Curtis Schmidt, Barbara K. Spa-vin, Philip Speilman, Petiflor Speil-man, and Nancy Stacy, Respondents.

No. CV99–10417SVW(MANX).

United States District Court, C.D. California.

Sept. 6, 2000.

Ben Suter, Kelly J. Moynihan, Keesal Young & Logan, San Francisco, CA, for Petitioner.

Jeff Dennis Ferentz, Stuart A. Katz, Greenbaum & Katz, Newport Beach, CA, for Respondents.

ORDER CONFIRMING ARBITRATION AWARD AS TO PETITIONERS SERUYA, GANZ AND BEAR STEARNS AND REQUESTING FURTHER BRIEFING REGARD-ING LIABILITY OF PETITION-ERS ACKERMAN AND BSSC

WILSON, District Judge.

TO ALL PARTIES AND THEIR AT-TORNEYS OF RECORD:

## I. Background

Respondents are individuals who invest-ed their money with Robert Schmidt ("Schmidt"), an investment advisor. Schmidt was an investment advisor who owned and ran a company called Interna-tional Management Services ("IMS"). While there were a couple of other people who owned stock in IMS, they did not get involved with its operations, leaving Schmidt alone at the helm. Schmidt opened an account in IMS's name at peti-tioner Bear, Stearns & Co. ("Bear Stearns"), a brokerage house.

As it turned out, Schmidt was a thief and stole approximately $7 million of the

respondents' money. Schmidt is now in jail serving a ten year sentence for embezzlement. Respondents brought an action against Bear Stearns & Company ("Bear Stearns"), Bear Sterns Security Corporation ("BSSC"), and several individuals who worked at Bear Sterns: Stephen Ackerman ("Ackerman"), Barry Ganz ("Ganz"), and "Mark Seruya." All parties agreed to binding arbitration. Thereafter, a lengthy arbitration took place. The arbitrators ultimately entered an award for the claimants based on claims of negligence and breach of fiduciary duty. All other claims were dismissed.

Defendants in the arbitration (now petitioners) have filed a motion to vacate the arbitration award, alleging that the arbitrators manifestly disregarded the law. Petitioners claim that they owed no duty to respondents because they were never customers of Bear Stearns. Respondents, on the other hand, have filed a motion to confirm the arbitration award. Both motions present essentially one narrow question: Did petitioners owe a duty to the respondents? If such a duty arguably existed, the arbitrators did not manifestly disregard the law and the arbitration award must be confirmed.

## II. Discussion

### A. Standard For Vacating An Arbitration Award

The Federal Arbitration Act ("FAA") provides only four instances where vacating an arbitration award is appropriate: (1) where the award was procured by fraud; (2) where there was corruption or evident impartiality of the arbitrators; (3) where the arbitrators were guilty of misconduct; and (4) where the arbitrators exceeded their powers. See 9 U.S.C. § 10(a)(1)-(4). Courts have interpreted the FAA to allow for vacation of an arbitration award where the arbitrators "manifestly disregarded" the law. See "Steel-

workers Trilogy": United Steelworkers v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); Todd Shipyards Corp. v. Cunard Line, Ltd., 943 F.2d 1056, 1060 (9th Cir.1991).

The Ninth Circuit has made clear that "manifest disregard" is a very "stringent standard." Id. "[C]onfirmation is required even in the face of 'erroneous ... misinterpretations of the law.' ... It is not even enough that the Panel may have failed to understand or apply the law .... An arbitrator's decision must be upheld unless it is 'completely irrational,' or it constitutes a 'manifest disregard of law.'" French v. Merrill Lynch, 784 F.2d 902, 906 (9th Cir.1986) (citations and notes omitted). In order to prevail on a claim of manifest disregard, petitioners must demonstrate that the "governing law alleged to have been ignored by the arbitrators [was] well defined, explicit, and clearly applicable." Carte Blanche (Singapore) Pte., Ltd., v. Carte Blanche Int'l, Ltd., 888 F.2d 260, 265 (2d Cir.1989) (quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 933-34 (2d Cir.1986)). An award will not be set aside "'because of an arguable difference regarding the meaning or applicability of [the law].'" Id. The error made by the arbitrators must have been obvious and "'capable of being perceived readily and instantly....'" Id. Moreover, "'the term 'disregard' implies that the arbitrator appreciat[ed] the existence of the clearly governing principle but decid[ed] to ignore it.'" Id.

### B. The Arbitrators Did Not Manifestly Disregard The Law By Concluding That A Duty Existed Between Petitioners Seruya, Ganz, Bear Stearns And Respondents

Petitioners argue that the arbitration award must be vacated because they never owed a duty to respondents, who

were not their customers, and that the existence of such a duty was a necessary prerequisite to a finding of negligence and breach of fiduciary duty. Petitioners urge that this is simply a question of law- and that the law is clear that no such duty exists.

Petitioners are correct that generally there is no duty between a brokerage house or broker-dealer and a noncustomer who has invested his or her money through an independent investment advisor. *See Congregation of the Passion v. Kidder Peabody & Co., Inc.,* 800 F.2d 177, 182–83 (7th Cir.1986); *Rolf v. Blyth, Eastman, Dillon & Co.,* 637 F.2d 77, 80 (2d Cir.1980). Therefore, liability may not be imposed on a "broker-dealer who merely executes orders for 'unsuitable' securities made by an investment advisor with the sole discretionary authority to control the account." *Rolf,* 637 F.2d at 80.

However, where there is additional involvement by the broker-dealer, a duty may be found. For example, in *Rolf v. Blyth,* 637 F.2d 77 (2d Cir.1980), the court found the existence of a duty running from a broker-dealer to individuals investing through an independent advisor where "the broker-dealer, although charged with supervisory authority over the advisor and aware that the advisor was purchasing 'junk,' actively lulled the investor by expressing confidence in the advisor without bothering to investigate whether these assurances were well-founded." *Id.* at 80. While not directly on point, the holding in *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 68 Cal. App.4th 445, 80 Cal.Rptr.2d 329 (1999) also supports the conclusion that broker-dealers may find themselves subject to liability where they aid in another's breach. In *Atascadero,* trust beneficiaries brought a claim against Merrill Lynch for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty by the trustee.

The trust beneficiaries alleged that Merrill Lynch had actively concealed the nature and volatility of investments made by the trustee. The court held that "securities brokers who have assisted a fiduciary or a trustee in speculating with trust funds and deceiving the beneficiaries of an investment trust as to the financial stability of the trust are directly liable to the beneficiaries themselves both for breach of the brokers' fiduciary duties, and for aiding and abetting the trustee's breach in order to further the brokers' own economic interests." *Id.* at 483, 80 Cal.Rptr.2d 329 (citations omitted). This was true despite the fact that the trustee was the actual customer of the broker and had already sued the broker. While the *Atascadero* case is not directly analogous because it involved a breach of fiduciary duty by a trustee, rather than an investment advisor, its reasoning remains persuasive. Like a trustee, an investment advisor may be considered a fiduciary. *See Leboce, S.A. v. Merrill Lynch, Pierce, Fenner, etc.,* 709 F.2d 605, 607 (9th Cir.1983). Therefore, if a broker-dealer aids in a breach of fiduciary duty by the investment advisor, it would appear that the broker could be liable for breach of his own fiduciary duties, as well as that of the independent advisor.

Thus, there is no per se rule that a broker-dealer has no duty to individuals who invest through an investment advisor. The inquiry is fact intensive and depends crucially on the broker-dealers level of involvement with the advisor and the advisor's clients. Where a broker-dealer lends credibility to an investment advisor by making positive statements about his investment record and skills, without investigating the basis for the assertions, the broker-dealer may be subject to liability. *See Rolf,* 637 F.2d at 80. After extensively reviewing the record, the Court concludes that there is some evidence that petitioners' Seruya, Ganz and Bear Stearns volun-

tarily lent their credibility to Schmidt, encouraged some individuals to invest with him and failed entirely to monitor Schmidt's investment activities. While the evidence is far from overwhelming, the Court concludes that it is sufficient to warrant upholding the arbitration award.

There is evidence in the record that petitioners Ganz and Seruya attended an money management meeting put on by Schmidt in Incline Village. Seruya was one of the key speakers at the meeting. At the conclusion of the meeting, several investors spoke with Ganz and Seruya about the possibility of investing in Schmidt's premium capture program. Respondent Franklin Dunn was one of the respondents who spoke with Seruya after the meeting. He asked about the possibility of opening an account with Bear Stearns. Seruya informed Dunn that Bear Stearns did not offer the type of premium capture program that Schmidt operated. Dunn testified that Seruya told him that Schmidt's premium capture program was "just a fabulous, fabulous, program" and that "Bear Stearns could not hope to match" it. *See* Testimony of Franklin Dunn, 10/30/98 at 14–15. Similarly, Rebecca Gonzalez also approached Seruya after the meeting to inquire about investing with Bear Stearns. Gonzalez testified that Seruya replied, "Well, you can open an account at Bear Stearns, but I would advise you to open your account directly with Schmidt because we cannot—Bear Stearns cannot—we cannot give you the same type of high yield that Mr. Schmidt's Premium Capture Program can." Testimony of Rebecca Gonzalez, 11/17/98 at 41:14–19. Melissa Crowley, another respondent, testified that she attended a business dinner with Schmidt and Seruya and that she was informed that Seruya was in town "for the purpose of assisting Mr. Schmidt in either explaining or marketing that program to other people in Incline [Village]." Testimony of Melissa Crowley, 3/30/99 at

4176:9–11. Crowley testified that Seruya was obviously aware of the nature of the program and that the program involved the funds of individual investors "[b]ecause that's what we discussed at our dinner was the marketing of the PCP program to other investors and to current investors and to increase their investment." *Id.* at 4177:25–26 to 4178:1–3. While the participation of Seruya and Ganz in the money marketing meeting is the most striking evidence of their involvement with Schmidt and their assurances of the profitability and security of investing with Schmidt, there is also other evidence of their involvement. For example, Schmidt utilized forms with Bear Stearns name on them. It is reasonable, under the circumstances, to assume that Schmidt obtained these forms from Bear Stearns. Thus, respondents were led to believe that Bear Stearns was lending its credibility to Schmidt's investment program. Bear Stearns also answered letters and phone calls from individual investors in Schmidt's program.

Bear Stearns argues that each respondent must demonstrate separately that petitioners reached out to him or her, in order to establish the existence of a duty. The Court concludes that the arbitrators did not manifestly disregard the law by concluding that once a broker-dealer promotes the investment program of a person like Schmidt, the broker-dealer may be liable to those who invested in Schmidt's program in partial reliance of the fact that its credibility has been enhanced by a reputable brokerage firm. The record makes clear that Schmidt made the most of his connections with Bear Stearns in order to attract clients and increase their investments. While petitioners may not have been personally involved in persuading each investor/respondent to participate in Schmidt's investment program, once they gave positive assurances to some of

Schmidt's potential investors, it was reasonable to assume that petitioners' names and reputations would be used by Schmidt to obtain additional investors. Therefore, the arbitrators did not manifestly disregard the law by holding petitioners liable to some respondents with whom they had no direct personal contact.[1]

Once petitioners assumed such a relationship with Schmidt and respondents, it was not unreasonable for the arbitrators to conclude that petitioners had some duty to monitor the activities of the IMS account. It is undisputed that they did not. In addition, respondents presented testimony that many red flags should have alerted petitioners to the problems with the IMS account, such as (1) the rapid flow of funds in and out of the IMS account, (2) the discovery of Schmidt's numbered investor account statements, and (3) Schmidt's use of the blank Bear Stearns forms to open accounts at Bear Stearns. Additionally, Schmidt was not a licensed broker or financial advisor and Bear Stearns, through at least Seruya and Ganz, was aware that Schmidt was acting in that capacity. Thus, the arbitrators did not manifestly disregard the law by concluding that petitioners Seruya and Ganz were negligent in failing to properly supervise the IMS account. The Court also concludes that the arbitrators did not manifestly disregard the law by concluding that Bear Stearns, as the brokerage firm employing Seruya and Ganz could be held vicariously liable for the acts of Seruya and Ganz and primarily liable for its own failure to properly supervise the IMS account.

In addition, to attacking the substantive basis for the arbitration award, petitioners also argue that the arbitration award should be overturned because the damages awarded were illogical. The arbitrators engaged in a lengthy review of this case, sitting through 81 hearings. It is not for this court to second-guess at how they arrived at their damage calculation. While the damage awards do not correspond to the amount invested by each respondent, the Panel may have determined damages based on another method, such as the extent of contact between petitioners and respondents which warranted respondents' reasonable reliance. As the Supreme Court has stated, "where it is contemplated that the arbitrator will determine remedies for ... violations that he finds, courts have no authority to disagree with his honest judgment in that respect. If the courts were free to intervene on these grounds, the speedy resolution of grievances by private mechanisms would be greatly undermined." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987).

### III. Conclusion

The Court concludes that the arbitrators did not manifestly disregard the law by holding petitioners Ganz, Seruya and Bears Stearns liable to respondents for negligence and breach of fiduciary duty. There is substantially less evidence supporting the award as to petitioners Ackerman and BSSC. Therefore, the Court requests that both petitioners and respondents submit supplemental briefing (of no more than fifteen pages) regarding the liability of Ackerman and BSSC by September 21, 2000. Each side may then file a response of no more than seven-pages by September 28, 2000.

IT IS SO ORDERED.

---

1. In addition, it appears that several of the respondents are related to each other. Under those circumstances, personal contact with one respondent would have a necessary spillover effect on other respondents.